**Paul MASTERS, Petitioner in Nos. 12046 and 12047,**

v.

**COMMISSIONER OF INTERNAL REVENUE,**

**Bill WILLIAMS (Vasilios Vasiliades), Petitioner in Nos. 12048 and 12049,**

v.

**COMMISSIONER OF INTERNAL REVENUE.**

**Nos. 12046–12049.**

United States Court of Appeals Third Circuit.

Argued Feb. 8, 1957.

Decided March 28, 1957.

Raymond J. Bradley, Philadelphia, Pa. (Thomas D. McBride, McBride, von Moschzisker & Bradley, Philadelphia, Pa., on the brief), for petitioners.

Walter Akerman, Jr., Washington, D. C. (Charles K. Rice, Asst. Atty. Gen., Lee A. Jackson, Harry Baum, Arthur I. Gould, Attorneys, Department of Justice, Washington, D. C., on the brief), for respondent.

Before McLAUGHLIN, STALEY and HASTIE, Circuit Judges.

McLAUGHLIN, Circuit Judge.

The taxpayers, operators of restaurants, kept two sets of business records during the years 1943–1947 and filed income tax returns reporting admittedly understated gross receipts. They contend the Commissioner has not proved fraud nor the correct amount of the understatement, and that there are compensating understatements in deductible items in precisely the same amount consisting of premiums paid for black-market food and bonus payments to key employees in excess of the compensation permitted by the wage stabilization regulations.

The three restaurants involved are all located in Philadelphia; at 326 North Broad Street, at 5221 Frankford Avenue, and at 6940 Market Street. Williams owned and ran the Broad Street and Frankford Avenue places in his individual capacity. Masters and Williams were partners in the Market Street restaurant since 1937. The profits were divided one-third to Masters and two-thirds to Williams since approximately 1943. All of the restaurants offered counter and table service, were operated twenty-four hours a day, serving breakfasts, luncheons, dinners and food for consumption off the premises.

The cashiers made daily entries of cash receipts and disbursements as determined by cash register readings in a book known as a "Diary" for the Broad Street and Market Street restaurants. Each diary covered one year. On the back of each book a record was kept of miscellaneous receipts from the sale of grease and for music box use. The cashier at Frankford Avenue restaurant made a similar record on sheets of paper of the cash receipts and disbursements.

The second set of books was under the supervision of Costas Demetriou, a bookkeeper employed by Williams since 1939 He also prepared monthly statements, Williams' income tax returns for the taxable years 1943 to 1947, inclusive, and Masters' returns and the partnership returns for the years 1944 to 1947, inclusive. Expenses were copied from the first set of books to the second set of books by either the restaurant cashiers, the bookkeeper or an employee of the latter. Under instructions of Williams and Masters the receipts were not entered in the second set of books until the end of the year, at which time Williams told Demetriou how much income to report for the year.

Williams showed Demetriou various memoranda purporting to contain a record of approximate amounts of unrecorded over-ceiling payments claimed to have been made for food products and wages paid to employees. During the years in question the prices for food products purchased and wages paid employees were fixed by the Emergency Price Control Act of 1942, 56 Stat. 23, 765, as amended, and the Stabilization Extension Act of 1944, 58 Stat. 632, as amended, respectively. 50 U.S.C.A.Appendix, § 901 et seq. The bookkeeper allegedly computed how much the daily receipts should be understated to balance the amount of the asserted over-ceiling payments. The latter were not entered as expenses on the books of the restaurants nor sought as deductions on the tax returns.

■■ In the absence of fraud with the intent to evade tax,[1] the statute of limitations is a bar for all years in controversy except 1944. The 1944 tax may be assessed without fraud if there was a 25% understatement of gross income.[2] The Commissioner has the burden of proof on the fraud issue.[3] In this matter the returns were acknowledged to be false. The taxpayers concededly failed to report all their gross receipts from business. Such full report is indispensable to the proper computation of taxable income. The taxpayers were aware of the falsity of the returns. The only purpose their failure served was to conceal the receipts. Evidence of a conscious failure to include in the return receipts from a taxable source is sufficient to take the fraud issue to the trier of fact,—in this case the Tax Court. There is hardly a more routine badge of income tax fraud than a double set of records. Spies v. United States, 1943, 317 U.S. 492, 63 S.Ct. 364, 87 L.Ed. 418.

The bookkeeper, Demetriou, testified that he wrote Greek notations on various ledger pages, "100—25 Daily"; "$10"; "Less $140 daily". As to the meaning of these notations he testified:

"A. The first ones that he gave me, Mr. McBride, was only a plain figure there, which could make me remember what happened; but after I saw the other handwriting with the Greek words where it says 'Less $100 daily', then I realized that is what must have happened.

"Q. What must have happened? A. The receipts were understated by that amount.

"Q. Now, wherever it says 'Less $100' that means you deducted $100 from receipts? A. Daily, from the receipts.

1. Section 275 and 276(a) of the Internal Revenue Code of 1939, 26 U.S.C. §§ 275, 276(a), 1952 ed.

2. Section 275(c) of Internal Revenue Code of 1939.

3. Section 7454 of the Internal Revenue Code of 1954.

"Q. But only where it says that? A. That is right.

"Q. Where it doesn't say 'Less $100 daily' or '$50 daily' it doesn't mean that, does it? A. If it says anything else, a figure is there; it might be the same."

■ Regarding the alleged over-ceiling payments for food and wages, there is only the self-serving testimony of Williams. It is uncorroborated by any receipts, checks or other documentary evidence. None of the recipients of the contended for over-ceiling payments was produced. Since the taxpayers failed to furnish the investigating Internal Revenue agents the information regarding the claimed over-ceiling payments, the government was under no obligation to negative this exculpatory evidence. Cf. Holland v. United States, 1954, 348 U.S. 121, 135–136, 75 S.Ct. 127, 99 L.Ed. 150.

The Commissioner added to gross receipts the amounts indicated by the notations on the ledger sheets described above. Taxpayers say that since there is testimony of over-ceiling payments having been made which were not recorded in the books used by the Commissioner to compute the deficiencies, the Tax Court was required to estimate and allow additional deductions under Cohan v. Commissioner, 2 Cir., 1930, 39 F.2d 540, 543–544. The Tax Court held that there was no reliable evidence on which to base an estimate, inferentially discrediting Williams' testimony.

■ On their returns and on their books, the taxpayers recorded their claimed deductions. A reasonable inference arises therefrom that they had no additional deductions. These records were admissions against the taxpayers' pecuniary interest. The Commissioner and the Tax Court were justified in relying on them. The vague, unsupported statements of Williams about additional unrecorded expenses, are unconvincing in contrast. The Tax Court was not required to believe them. Chesbro v. Com-

missioner, 21 T.C. 123, affirmed 2 Cir., 1955, 225 F.2d 674, certiorari denied 350 U.S. 995, 76 S.Ct. 544, 100 L.Ed. 860.

Petitioners also challenge three rulings of the Tax Court on admission and exclusion of evidence. Two of those concern exclusions for irrelevancy. Those decisions were well within the discretion of the trial judge. The third has to do with the allowance in evidence of proof of the convictions of both taxpayers resulting from their pleas of nolo contendere to indictments for income tax evasion for the years 1945 through 1947.

■ What we are dealing with is not a mere plea but a judgment of conviction and sentence thereon. Appellants urge that under those circumstances their convictions may not be put into evidence as affecting their credibility. The argument is without merit. There is no valid distinction between a judgment of conviction based on a plea of "nolo contendere" and such judgment entered after a plea of "guilty". The former is an attempted face saving process. A trial judge may at times consent to that procedure but when it is followed by judgment of conviction and sentence it merely provides a surface language cloak which is completely removed by the judgment and sentence. That type of conviction is admissible evidence for impeachment purposes. Kilpatrick v. Commissioner of Internal Revenue, 5 Cir., 1955, 227 F.2d 240, 243; Pfotzer v. Aqua Systems, 2 Cir., 1947, 162 F.2d 779, 785; Fisher v. United States, 1 Cir., 1925, 8 F.2d 978, 981; United States v. Dasher, D.C.E.D.Pa.1943, 51 F.Supp. 805, 806.

The Tax Court is bound by the rules of evidence applicable in the courts of the District of Columbia, Section 1111, Internal Revenue Code 1939 and its successor, Section 7453 of the 1954 Code, where there is a statute providing that the conviction of a crime may be given in evidence to affect credibility. Section 14–305, District of Columbia Code 1951 Ed. Apparently there is no reported case to date in the District of Columbia specifically holding that a conviction un-

der the present circumstances is within the above referred to statute but from both Thomas v. United States, 1941, 74 App.D.C. 167, 121 F.2d 905, 907 and Crawford v. United States, 1930, 59 App.D.C. 356, 41 F.2d 979, 980 it is inferable, contrary to the contention of appellants, that when the problem does come before the courts of the District the evidence will be held admissible in accordance with the great weight of authority. Kitchen v. United States, 1955, 95 U.S.App.D.C. 277, 221 F.2d 832 cited by appellants is not pertinent.

■ In connection with this point it is suggested that the acceptance into evidence of the conviction of appellant Masters although he did not testify at the hearing was error. While Masters did not personally take the stand, his sworn tax returns were in evidence as were his other records. The evidential credibility of those documents which actually amounted to Masters' individual evidential credibility was the predominant issue in this cause as far as he was concerned, just as much as if he had been sworn as a witness. Under the trial circumstances the acceptance of the record of his conviction was within the statute.

It is suggested that because the Tax Court did not categorically note that the Masters' conviction evidence was received under the District of Columbia law it must be concluded that it was given undue decisional weight. This thought ignores the all important fact that the Tax Court in the trial of this case, by the direct command of its governing law, the Internal Revenue Code, was functioning evidentially in accordance with the District of Columbia statute.[4] There was no necessity here of spelling this out in the findings of fact.

The decision of the Tax Court will be affirmed.

HASTIE, Circuit Judge (dissenting).

I differ with the majority in my understanding and analysis of the facts found by the Tax Court. The majority seem to read the Tax Court opinion as rejecting the taxpayers' factual claim that substantial over-ceiling payments for wages and commodities were among the costs of their business. However, I think the Tax Court found that such expenditures were made, although the method of accounting for them in the tax returns was improper and the stated amounts were questionable. To make this point clear it is necessary to quote at some length from the findings of the Tax Court. After stating that the taxpayers kept a second set of books in which gross receipts were stated at less than their correct figure as shown in the original records, the findings below continue as follows:

"* * * This second set of books was, under instructions from Williams and Masters, kept open as far as receipts were concerned until the end of the year, at which time

---

**4.** In a recent District of Columbia district court opinion, Stagecrafters' Club, Inc., v. District of Columbia Division of American Legion, supplemental opinion, D.C. 1953, 111 F.Supp. 127, 128 (main opinion D.C., 110 F.Supp. 481), affirmed per curiam 1954, 94 U.S.App.D.C. 74, 211 F. 2d 811, the court, in a sound consideration of the scope of the admissibility of a prior conviction in a related civil suit, held that:

"However, where the issue in the criminal case was clear, the defendant appeared, was represented by counsel, had an opportunity to testify and present his witnesses and to cross-examine the witnesses against him, and was duly convicted, there is no sound reason why the judgment of conviction should not be admitted in a civil case based on the same facts as at least prima facie evidence of those facts."

In that suit, there being no rebutting evidence, the court ruled the convictions were conclusive proof of the unlawful use of the premises and decisive of the civil action. Though the analogy of that situation to the one at bar has not been argued, it would seem to bear a close relationship and to strongly support not only the admission of the conviction records but their use, prima facie at least, to show appellants' fraud in filing false and fraudulent income tax returns for the years 1945 to 1947 inclusive.

Williams told Demetriou [bookkeeper] how much income to report for the year and gave him various memoranda purporting to contain a record of unrecorded over-ceiling payments he claimed to have made during the year in the case of each of the restaurants. Thereupon, Demetriou computed the amount the daily receipts should be understated to balance such unreported items and the resulting understated receipts were then entered in the second diary for each restaurant. The understatements as determined by respondent were as follows:" [A detailed table is inserted at this point.]

"From the receipts and expenditures recorded in the second diaries, summaries were prepared by Demetriou at the end of each year on work sheets, and from these sheets Demetriou prepared the income tax returns involved herein."

"* * * The over-ceiling payments referred to above were those approximated by Williams in excess of prices fixed by law to obtain certain scarce commodities in sufficient quantity for the restaurants and those made to certain employees in the form of extra wages. The black-market overpayments and, in the case of commodities, in some instances the entire purchase price, were not entered as expenses on the records of the restaurants nor were they claimed as deductions on any of the tax returns involved herein. This method of understating receipts to compensate for any over-ceiling payments was devised to circumvent the law and OPA regulations and to keep Williams from having trouble with the Rationing Board in case an examination of his books was made thereby. Williams

also did not wish to have trouble with the merchants who were thus supplying him. Social security taxes were neither withheld nor paid on excess wages."

To me this amounts to a finding that over-ceiling payments were made and credit was taken for them in income tax returns by understating gross receipts.

But then the Tax Court, in calculating the taxpayers' tax deficiency, refused to make any allowance for these payments, justifying its position by saying:

"* * * Albeit, the amounts allegedly paid by Williams in excess of the maximum price fixed by law for commodities used by the restaurants during the years involved, if proved, might be includible in determining the cost of goods sold by the restaurants in such years, Lela Sullenger, 11 T.C. 1076, and I.T. 4104, C.B. 1952–2, p. 71, this record contains no reliable evidence as to the amounts actually expended for over-ceiling prices of commodities and for extra wages. This being true, the record made affords no basis for our making a reasonable estimate."

It is at this point that I think the Tax Court erred. It had first concluded, on the basis of the evidence introduced by the taxpayers, that expenditures made in the course of their business included over-ceiling payments for wages and commodities. However, the Tax Court may well have believed that, in reporting the dollar amounts of such payments to their bookkeeper from time to time, the taxpayers transmitted inaccurate and exaggerated figures. But this belief that the items were inflated did not justify the elimination of this entire expense category from the court's computation of tax liability.[1]

1. I find unpersuasive a contention that as a matter of law over-ceiling payments of wages are not deductible. This argument is based upon Executive Order No. 9250, 7 Fed.Reg. 7871. But this basis was lost when Executive Order No. 9250 was superseded with Presidential approval on October 27, 1942, by other and different Regulations of Economic Stabilization Director, Title 32, Chapter XVIII, subchapter A, Part 4001, 7 Fed.Reg. 8748.

Judge Learned Hand's often cited treatment of George M. Cohan's estimate of his deductible entertainment expenses seems so much in point as to warrant an extended quotation:

"In the production of his plays Cohan was obliged to be free-handed in entertaining actors, employees, and, as he naively adds, dramatic critics. He had also to travel much, at times with his attorney. These expenses amounted to substantial sums, but he kept no account and probably could not have done so. At the trial before the Board he estimated that he had spent eleven thousand dollars in this fashion during the first six months of 1921, twenty-two thousand dollars, between July first, 1921, and June thirtieth, 1922, and as much for his following fiscal year, fifty-five thousand dollars in all. The Board refused to allow him any part of this, on the ground that it was impossible to tell how much he had in fact spent, in the absence of any items or details. The question is how far this refusal is justified, in view of the finding that he had spent much and that the sums were allowable expenses. Absolute certainty in such matters is usually impossible and is not necessary; the Board should make as close an approximation as it can, bearing heavily if it chooses upon the taxpayer whose inexactitude is of his own making. But to allow nothing at all appears to us inconsistent with saying that something was spent. True, we do not know how many trips Cohan made, nor how large his entertainments were; yet there was obviously some basis for computation, if necessary by drawing upon the Board's personal estimates of the minimum of such expenses. The amount may be trivial and unsatisfactory, but there was basis for some allowance, and it was wrong to refuse any, even though it were the traveling expenses of a single trip. It is not fatal that the result will inevitably be speculative; many important decisions must be such. We think that the Board was in error as to this and must reconsider the evidence." Cohan v. Commissioner of Internal Revenue, 2 Cir., 1930, 39 F.2d 543–544.

I would reason in the same way here. Compare, in a different context, Judge Kalodner's reasoning in Commissioner of Internal Revenue v. Thompson, 3 Cir., 1955, 222 F.2d 893, 895.

Accordingly, I would vacate the decision of the Tax Court and remand the cause for fact finding as to the amounts spent by the taxpayers in the course of their business for over-ceiling payments, to be followed by a recalculation of tax liability taking these expenditures into account. And even if one should be less confident than I that the language of the Tax Court amounts to an affirmative finding that money was spent for over-ceiling charges, at very least the findings contain a strong intimation to that effect and nothing contrary. Even this would call for a remand for clear and definitive fact finding as to whether such payments were made and, if so, in what amounts. Cf. Showell v. Commissioner of Internal Revenue, 9 Cir., 1956, 238 F.2d 148.