**CLUB GAONA, INC., a non-profit organization, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**No. 1796–ND.**

United States District Court
S. D. California, N. D.
Nov. 10, 1958.

Crossland, Crossland & Richardson, by Baxter K. Richardson, Fresno, Cal., for plaintiff.

Laughlin E. Waters, U. S. Atty., Edward R. McHale, Asst. U. S. Atty., Chief, Tax Division, by Robert H. Wyshak, Asst. U. S. Atty., Los Angeles, Cal., for defendant.

YANKWICH, Chief Judge.

This action was instituted to recover a total of $29,897.64 in internal revenue taxes[1] paid for the calendar years 1941 to 1949, inclusive. The taxes for 1941–1947, inclusive, and for the period from January 1 to February 26, 1948, were assessed against, and paid by, the plaintiff's predecessor of the same name, to be referred to as "the Club", which was an unincorporated association. Both are named, as the Preamble to the Constitution and By-Laws of the plaintiff states, "in honor of the famed Mexican bullfighter 'Rodolfo Gaona.'" The taxes for the remainder of the year 1948 and for the year 1949 were assessed against and paid by the plaintiff, after its incorporation, when it succeeded to all the assets, liabilities, rights, duties and obligations of the Club. Timely claims for refunds have been made and rejected.

The basic fact upon which the assertion that the taxes were illegally assessed and collected is stated repeatedly in the complaint to be that its predecessor

"was exempt from income taxes as being a civic league or organization not organized for profit but operated exclusively for the promotion of social welfare"

and that the plaintiff itself, for the partial year 1948 and the full year 1949,

"was exempt from federal income taxes as being a fund or foundation organized and operated exclusively for charitable, religious and educational purposes, no part of the net earnings of which inured to the benefit of any private shareholder or individual, and no substantial part of the activities of which was the carrying on of propaganda, or otherwise attempting, to influence legislation."

There is the added allegation that

"at no time during the existence of plaintiff were any of its activities whatsoever involved in or devoted to the carrying on of propaganda, or otherwise attempting, to influence legislation."

Plaintiff thus seeks to bring itself within the purview of § 101(8) of the Internal Revenue Code of 1939 which reads:

"§ 101. Exemptions from tax on corporations.

"Except as provided in paragraph (12) (B) and in supplement U, the following organizations shall be exempt from taxation under this chapter—* * *

"(8) Civic leagues or organizations not organized for profit but operated exclusively for the promotion of social welfare, or local associations of employees, the membership of which is limited to the employees of a designated person or persons in a particular municipality, and the net earnings of which are devoted exclusively to charitable, educational, or recreational purposes."[2]

Some courts in interpreting this clause have adopted what is known as "the ultimate destination" test.[3] This test has, however, been rejected by other courts of appeals, including the Court of Appeals

---

1. 28 U.S.C.A. § 1346(a) (1).

2. 26 U.S.C.A. 1955 ed., § 101(8).

3. Roche's Beach, Inc. v. C. I. R., 2 Cir., 1938, 96 F.2d 776; Lichter Foundation, Inc. v. Welch, 6 Cir., 1957, 247 F.2d 431, 435, 437.

for the Ninth Circuit.[4] They hold that whether an organization is exempt is to be determined by its particular nature, the purposes for which it was organized and the activities which it actually carried on after its organization. The complaint in this case alleges, in various counts, that the plaintiff and its predecessor were

> "funds or foundations organized and operated exclusively for charitable, religious and educational purposes, no part of the net earnings of which inured to the benefit of any private shareholder or individual, and no substantial part of the activities of which was the carrying on of propaganda, or otherwise attempting, to influence legislation."

The preamble to the plaintiff's Constitution, adopted in 1949, recites:

> "With the utmost purpose in mind to promote a more cultural and progressive youth, and to educate in a general scope, and to develop into respectable American citizens the ever present youth of Mexican ancestry, we organize into a social and recreational Club, and strive to adhere to the task of developing healthy bodies and minds among our membership."

The Supreme Court of the United States has stated that an organization claiming exemption on educational or kindred grounds must, in the language of the statute, be devoted *exclusively* to one of the enumerated purposes:

> "This plainly means that the presence of a single non-educational purpose, if substantial in nature, will destroy the exemption regardless of the number or importance of truly educational purposes." [5]

There is authority for the assertion that the "exclusive" clause in § 101(8) [6] does not apply to civic leagues or organizations, a status which plaintiff claims for its predecessor and itself.[7] However, that ruling does not carry conviction and it has been repudiated by courts and text writers.[8] But whether we apply the "exclusive" test or not, it is evident from the record that whatever may have been the intention of the young men of Mexican descent who gathered in a private home on March 11, 1936, and organized, as their resolution denominated Act I, recites, "a club of young Mexicans because there had been none among our numerous colony. * * * To know each other in friendship", and the quoted "Preamble" to the plaintiff's Constitution reasserts, and whatever may have been the activities in which they engaged originally, *a change occurred in 1940.* In the years before, they met socially, conducted occasional dances, gathered on *Cinco de Mayo* and other Mexican National holidays, and assisted with small amounts of money and gifts to club members and officers and others of the same national group. However, beginning in the year 1940, as the complaint itself alleges, the chief activity was the promotion of *regular public dances*, which became the main source of income and resulted in continuously growing profits to

4. Squire v. Students Book Corp., 9 Cir., 1951, 191 F.2d 1018, 1020–1021; Ralph H. Eaton Foundation v. C. I. R., 9 Cir., 1955, 219 F.2d 527, 528–529; John Danz Charitable Trust v. C. I. R., 9 Cir., 1955, 231 F.2d 673, 676; Randall Foundation, Inc. v. Riddell, 9 Cir., 1957, 244 F.2d 803, 808; United States v. Community Services, 4 Cir., 1951, 189 F.2d 421, the reasoning of which is approved in Ralph H. Eaton Foundation v. C. I. R., supra, 219 F.2d at page 529; Smyth v. California State Automobile Ass'n, 9 Cir., 1949, 175 F.2d 752, 754; Scofield v. Rio Forms, Inc., 5 Cir., 1953, 205 F.2d 68, 72–73; Riker v. C. I. R., 9 Cir., 1957, 244

F.2d 220, 230–235, certiorari denied, 355 U.S. 339, 78 S.Ct. 50, 2 L.Ed.2d 51.

5. Better Business Bureau v. United States, 1945, 326 U.S. 279, 283, 66 S.Ct. 112, 114, 90 L.Ed. 67.

6. 26 U.S.C.A., 1955 ed., § 101(8).

7. United States v. Pickwick Electric Membership Corp., 6 Cir., 1946, 158 F.2d 272.

8. See Consumer-Farmer Milk Cooperative, Inc. v. C. I. R., 2 Cir., 1950, 186 F.2d 68, 71–72; 6 Mertens, Law of Fed. Income Taxation, 1948, Rev. ed. § 34.29. And see United States v. Community Services, supra, Note 4.

the organization. Plaintiff's Exhibit 8 shows the income from dances in 1941 to have been $2,587.50; the expenditures for the year on orchestra, advertising, rent, taxes and policing the dance hall amounted to $1,528.11, leaving a profit of $1,058.11. The following tabulation shows the subsequent income and expenditures, and profit or loss from the dances:

| Year | Income | Expenses | Profit | Loss |
|------|--------|----------|--------|------|
| 1942 | $ 576.65 | $ 840.02 | $ | $263.37 |
| 1943 | 21,211.45 | 10,223.06 | 10,988.39 | |
| 1944 | 22,363.49 | 10,247.54 | | |
| (Incomplete, because records for 1944 not available) | | | | |
| 1945 | 43,419.00 | 17,652.90 | 25,765.10 | |
| 1946 | 49,981.41 | 29,260.98 | 20,720.43 | |
| 1947 | $47,936.70 | 34,908.98 | 13,027.72 | |
| 1948 | 40,770.26 | 22,923.75 | 17,846.51 | |
| 1949 | 52,757.84 | 28,264.28 | 24,493.56 | |

Included in the expenditures are taxes which were as follows: 1941, $195.63; 1942, $277.52; 1943, $2,889.09; 1944, $3,436.44; 1945, $4,594.36; 1946, $9,-202.19; 1947, $9,362.30; 1948, $7,650.-19; 1949, $8,929.23. The total income from dances during the period 1941–1949, inclusive was $279,016.80. During this period the yearly income from dues was insignificant. During the same period, the "civic" activities were minimal. They consisted chiefly of sending small gifts to men of the group serving in the Armed Forces of the United States, in the form of stationery, trinkets made by the women or subscriptions to the local newspapers, and participation with other groups in celebrating in May and September events in Mexican history. The activities of the Club and the plaintiff in the acquisition and sale of real property are very revealing. On August 7, 1945, a 40-acre site at Church and Walnut Avenue, in Fresno, California, was purchased. This was later sold at a profit, the reason given for the sale being that after the preparation of the architect's plans, it was evident to the Executive Board that the project could not be financed. A 10-acre tract was purchased in April, 1947, for the sum of $10,000. On April 30, 1947, *at the very meeting at which the purchase of this tract was announced,* a motion was carried "that the property first purchased by the Club (the 40-acre tract) be sold." Instead of the newly-acquired property being devoted to the establishment of a meeting place or club facilities,—which were given as one of the main aims of the organization because of claimed boycott of minority groups by owners of buildings and meeting places—it was leased for farming, after an expenditure of $1,600 to develop a water supply adequate for the growing of open crops. The plans drawn in 1948 for the use of this property by the plaintiff, which are in evidence, show conclusively that, after its acquisition, the main object was to build what the architects themselves designated on their plans as the "Gaona Dance Hall." At the time, the organization was meeting in a neighborhood community house. The dances were being conducted at a hall named the "Palomar Ballroom," which was owned by a group known as the Italian Entertainment Park, Inc. On April 30, 1947, the minutes of the Club state:

"A sum of $15,000.00 has been lent by the Club to the Italian Entertainment Park at 5% interest for a period of 3 to 5 yrs. *Mortgage on the Park is now held by the club.*

"Land has been purchased by the Club on the corner of Whitesbridge and Hughes this was 10 acres at $10,000.00." (Emphasis added)

The loan was made, as testified by some of the Club's former officers, in order to enable the owners of the Palomar Ballroom to meet their obligation on an indebtedness which, presumably, was an encumbrance on the real property on which the ballroom was located. But the record shows that, on that date, *there were no encumbrances on the property.* Encumbrances in the form of liens and a deed of trust were executed later. So, evidently, the money was used by the owners of the Palomar Ballroom to meet pressing obligations incurred in building the dance hall. *No mortgage to the Club or to its Executive Board was executed* to secure the loan, although the loan *was later approved by the membership.* On November 18, 1952, a new note was executed *to the plaintiff for the total sum originally lent.* Significantly, the note stated: *"This note is secured by no collateral."* Under the law of California, certain unincorporated associations are permitted to hold and convey property, and to lease, mortgage, pledge and encumber the same.[9] But this is in derogation of the general rule.[10] Conceivably an unincorporated association might engage in a commercial enterprise, including the lending of money, if this be consistent with the scope of its activities,[11] or is authorized by its Constitution or By-Laws.[12] The Articles of Incorporation of the plaintiff authorized the corporation to purchase real property and "to loan money upon or without security." The By-Laws adopted by the plaintiff in 1949, after incorporation, contain the following provisions as to real property:

"All Real Estate and Property developed or undeveloped, whether unencumbered or otherwise, the nature of which shall be intangible, and which has been purchased with Club funds by total capital outlay, or by legal contract, must be deeded to Club Gaona, as an incorporated nonprofit Club, and the trust thereof shall be vested within the Executive Board. No final disposition of such Real Estate or Property shall be made by the Executive Board without first obtaining full sanction of the general membership." (Article III, Section 11.)

But neither the Constitution nor the By-Laws contain *any regulations* as to the lending of money. So, the Articles of Incorporation are the sole authority for the power to lend money. And it is doubtful whether, if the question arose, any court would hold that a nonprofit organization, organized for social purposes only, could lend money in the circumstances in which this money was lent. This is not to impugn the motives of the members of the Club's Executive Board who felt that in making the loan they were acting in the best interest of the corporation, or of the plaintiff who took over the promissory note. The fact that they engaged in these activities,—purchase and sale of real property, expenditure of money in improving such property, in order to secure an income from an agricultural lease, a large loan of money without security to a corporation evidently insolvent,—indicates that beginning in 1940 and through 1949 the Club and the plaintiff derived their income from the promotion of public dances at a profit and that the profits were devoted to the accumulation of funds which were *not used for any ascertainable civic projects.* On the contrary, they were used in *speculative real estate dealings,* to which was added the indubitably *ultra vires* loan to an insolvent debtor.

Much is made of the fact that they promoted a baseball team. But this venture was of short duration. The team was authorized on April 24, 1946; it was abandoned on April 30, 1947. And the plans for the improvement of the 10-acre

9. West's Ann.California Corporations Code, § 21200.

10. 5 Cal.Jur.2d, Associations and Clubs, § 29.

11. 5 Cal.Jur.2d, Associations and Clubs, § 27.

12. Cuzner v. California Club, 1909, 155 Cal. 303, 311–312, 100 P. 868, 20 L.R.A., N.S., 1095.

tract, dated August 10, 1948, *show no intention to devote any of it to a baseball diamond*. Indeed, the only facility contemplated was a dance hall. No club rooms, card, billiard or other game rooms, bowling alleys, basketball or tennis courts, locker rooms, showers or any other facilities used for the diversion or entertainment of young persons,—and of the type available at the Y.M.C.A. or American Legion and other social groups, which were considered by the courts and Treasury Regulations to be civic leagues or clubs before the 1950 amendment of § 101 of Title 26,—were ever planned. The legislative history of the 1950 amendment indicates the intention of the Congress to exclude from the benefits of the section organizations which, *like the plaintiff and its predecessor*, although nominally nonprofit organizations, actually *are not carrying on an exempt purpose*, but are, in reality, "in direct competition with other taxable business." [13]

With the ending of the war in 1945, the sending of small gifts to servicemen ceased. After that, the only activities reflected in the minutes introduced in evidence and dated between September, 1945 and September, 1949,—other than the $15,000 loan and the dealings in real estate,—are the conduct of the dances, regulations as to purchase and sale of tickets for them, the compensation of members who acted as ushers or otherwise helped at the dances, the hiring of policemen to keep order and the like. One of the officers of the Club frankly conceded that the only matters of a civic nature which they continued to engage in were participation in the *Cinco de Mayo* and other National Mexican and Latin American celebrations, and limited association with the International Institute, a local group which fostered Americanism among foreign born citizens and persons of foreign descent.

Oral testimony "even in the absence of any direct conflicting testimony," may be disregarded if it contains omissions or inconsistencies, is inherently implausible or improbable, or is contradicted by the facts.[14] So may testimony as to intent be disregarded if in conflict with proved facts or uncorroborated by written data.[15] And the taxpayer who seeks exemption from taxation has the burden of proving by clear and convincing proof that he is within a specific exemption clause.

As stated in an old case,

"a claim for exemption from taxation must be clearly made out." [16]

In the realm of tax exemptions, doubts as to the meaning of a statute or

13. See H.R. No. 2319, 81st Congress, 2nd Session, pp. 36–37, 41–42, 124, as quoted in United States v. Community Services, supra, Note 4, 189 F.2d at pages 426–427.

14. Quock Ting v. United States, 1891, 140 U.S. 417, 420–421, 11 S.Ct. 733, 35 L. Ed. 501; Grace Bros., Inc. v. C. I. R., 9 Cir., 1949, 173 F.2d 170, 176–178; Mitsugi Nishikawa v. Dulles, 9 Cir., 1956, 235 F.2d 135, 140–141; Masters v. C. I. R., 3 Cir., 1957, 243 F.2d 335, 338. And see Viles v. C. I. R., 6 Cir., 1956, 233 F.2d 376, 379; Winters v. Dallman, 7 Cir., 1956, 238 F.2d 912, 914; Hasson v. C. I. R., 6 Cir., 1956, 239 F.2d 778, 782; Anderson v. C. I. R., 5 Cir., 1957, 250 F. 2d 242, 248.

15. Grace Bros., Inc. v. C. I. R., supra, Note 14, 173 F.2d at pages 177–178; Masters v. C. I. R., supra, Note 14, 243 F.2d at page 333.

16. Bank of Commerce v. State of Tennessee, to Use of City of Memphis, 1896, 161 U.S. 134, 146, 16 S.Ct. 456, 460, 40 L.Ed. 645. In Lloyd v. C. I. R., 3 Cir., 1946, 154 F.2d 643, 646, the principle is summed up in this manner:

"Claiming an exemption from a tax, the taxpayer has the burden of satisfying the requirement that the facts fit clearly within the exempting clause of the statute."

There has been no deviation from this approach by the courts in more recent cases. See, Botany Worsted Mills v. United States, 1929, 278 U.S. 282, 289–290, 49 S.Ct. 129, 73 L.Ed. 379; Reinecke v. Spalding, 1930, 280 U.S. 227, 232–233, 50 S.Ct. 96, 74 L.Ed. 385; New Colonial Ice Co., Inc. v. Helvering, 1934, 292 U.S. 435, 440, 54 S. Ct. 788, 78 L.Ed. 1348; Franciscus Realty Co. v. C. I. R., 8 Cir., 1930, 39 F.2d 583, 586; Doll v. Glenn, 6 Cir., 1956, 231 F.2d 186; Cappel House Furnishing Company v. United States, 6 Cir., 1957, 244 F.2d 525, 529.

as to its applicability to the particular category in which the taxpayer claims to be, are resolved against the taxpayer. Evidence which merely gives rise to doubt as to whether the exemption was properly disallowed is not sufficient. The reason was stated by the Supreme Court of the United States in a noted opinion:

"Exemptions from taxation cannot rest upon mere implications. United States Trust Co. v. Helvering, 307 U.S. 57, 60, 59 S.Ct. 692, 693, 83 L.Ed. 1104. As stated by Mr. Justice Cardozo in Trotter v. State of Tennessee, 290 U.S. 354, 356, 54 S. Ct. 138, 139, 78 L.Ed. 358, 'Exemptions from taxation are not to be enlarged by implication if doubts are nicely balanced.' And see Pacific Co., Ltd., v. Johnson, 285 U.S. 480, 491, 52 S.Ct. 424, 426, 76 L.Ed. 893. Hence broad, generalized statutory exemptions have frequently been construed narrowly and confined to those situations where the subject matter of the exemption was directly, not indirectly or remotely, involved." [17]

As exemptions do not depend upon equitable considerations, but are acts of legislative grace, they are to be construed and applied strictly.[18]

*To conclude:*

In what precedes we have indicated certain outstanding and, chiefly, undisputed facts which warrant the conclusion that the plaintiff has failed to meet the burden of proving that it and its predecessor, or either, were entitled after 1940 to exemption from the taxes sought to be recovered, as a social club or a civic league or organization "not organized for profit", but operated exclusively for educational purposes or the promotion of social welfare under the provisions of clauses (6) or (8) of § 101 of the Internal Revenue Code of 1939. Other facts in the record could be pointed to which reinforce this conclusion. To do so would merely extend this opinion, without profit. What has been said indicates adequately the grounds for the conclusion reached.

Judgment will, therefore, be for the defendant, that the plaintiff take nothing by its complaint. Costs to the defendant. Findings of fact and conclusions of law and judgment to be prepared by the counsel for the defendant under Local Rule 7, West's Ann.Code.

---

17. United States v. Stewart, 1940, 311 U.S. 60, 71, 61 S.Ct. 102, 109, 85 L.Ed. 40.

18. New Colonial Ice Co., Inc. v. Helvering, supra, Note 16, 292 U.S. at page 440, 54 S.Ct. at page 790; Deputy v. du Pont, 1940, 308 U.S. 488, 493, 60 S.Ct. 363, 84 L.Ed. 416; Zimmermann v. C. I. R., 8 Cir., 1957, 241 F.2d 338, 344; City of Anchorage v. Chugach Electric Association, 9 Cir., 1958, 252 F.2d 412, 416.