**I. E. DOGGETT, Petitioner,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

**No. 7915.**

United States Court of Appeals
Fourth Circuit.

Argued Oct. 21, 1959.

Decided March 8, 1960.

Daniel R. Dixon, Raleigh, N. C., for petitioner.

Carolyn R. Just, Attorney, Department of Justice, Washington, D. C. (Charles K. Rice, Asst. Atty. Gen., Lee A. Jackson and I. Henry Kutz, Attorneys, Department of Justice, Washington, D. C., on brief), for respondent.

Before SOBELOFF, Chief Judge, and SOPER and HAYNSWORTH, Circuit Judges.

HAYNSWORTH, Circuit Judge.

The principal question arises out of the imposition of fraud penalties on income tax deficiencies for the years 1942–1946. Though the taxpayer admits the presence of false entries in his books during the years 1942–1945 and unrecorded and unreported receipts during 1946, he earnestly attributes all fault to his bookkeeper whom he charges with embezzlement and perjury. The bookkeeper, as earnestly, protests his innocence of those crimes, but admits he falsified the records, under taxpayer's instructions, for the purpose of concealing income.

The Tax Court accepted the bookkeeper's version of the matter and found corroboration of it in a number of collateral circumstances. The taxpayer finds in those and other collateral circumstances such support of his own version of the matter that he asks this Court to hold that findings based upon the bookkeeper's testimony were clearly erroneous.

The question is one of fact. We cannot say the Tax Court was clearly wrong in its resolution. We must, therefore, accept its findings.

The taxpayer, a man of minimal education, achieved remarkable success as the proprietor of a taxicab business in Raleigh, North Carolina. During the years in question, the Tax Court found that he had net income, respectively, of $33,334.70, $64,944.80, $81,383.23, $58,015.55 and $31,949.49[1] The Tax Court approved deficiencies for those years of $4,776.49, $13,201.92, $29,079.99, $9,662.26 and $7,526.82, the total of the deficiencies before interest and penalties being $64,247.48.

To some extent, the deficiencies were attributable to adjustments which, in themselves, carry no implication of fraud. Other portions of the deficiencies, however, were the direct result of falsified records. Fraud, there clearly was; the only question is whose.

The bookkeeper testified that he was employed by the taxpayer in 1941. Within a year thereafter, he says, the taxpayer told him he did not feel he should pay taxes upon all of his income and instructed him to find ways to reduce the tax obligation. There followed systematic overstatement of expense items and understatement of receipts, which continued, in varying forms, through the years in question.

In 1942 and 1943 one of the principal methods of falsification was to overfoot expense accounts in the journal and post the inflated total to the ledger. Other items, correctly recorded in the journal, would be overposted by $100.00, or some other even amount, in the ledger.

During 1944 and 1945, one of the principal means of understatement of income was the withdrawal of a portion of the cash receipts from cab operations before the balance was deposited in the bank and recorded in the journal. There was testimony that the taxpayer, or his wife, carefully checked the cash receipts from cab operations each day and correctly recorded the total in a cash book, which the taxpayer kept apart from the other books and records. Such cash receipts,

1. As of April 30, 1946 the proprietorship was incorporated. For the proprietorship, 1946 was a short year.

correctly recorded in the cash book, were understated in the journal. A number of adding machine tapes were introduced in evidence which showed a subtotal labeled "Bank" which was in agreement with the receipts as recorded in the journal, an additional item labeled "Red," the taxpayer's nickname, and a final total which was in agreement with the receipts as recorded in the cash book. The bookkeeper testified that he prepared such tapes and gave them to the taxpayer as a means by which the taxpayer could reconcile the cash book with the bank account and the journal.

In 1946, as well as other years, some receipts, other than cash receipts from cab operations, were either unrecorded or were credited directly to taxpayer's drawing account without having been recorded in any income or receipts account.

The taxpayer brushes aside the testimony of the bookkeeper as perjured, and seeks to avoid the finding that he was the profiteer and that his income tax returns were fraudulent, by concentration upon a permissible inference that the bookkeeper was an embezzler.[2]

First, the taxpayer points to the fact that his drawing account debits were overfooted by an aggregate of $172.35 in 1942 and by an aggregate of $1200.00 in 1943, these entries being offset by underfooting cash debits. While these amounts are relatively small, the taxpayer finds them very significant, for they are inconsistent with a purpose to conceal taxable income to him, but they are consistent with his premise of embezzlement by the bookkeeper. Because of the number and frequency of the entries which aggregate these small totals, he finds no room for an inference that they were made inadvertently, and he dismisses the bookkeeper's explanation that they were made during moments of pique.

Had the Tax Court rejected the bookkeeper's explanation of these entries

and accepted the taxpayer's premise as to these, it need not necessarily have exculpated the taxpayer. A bookkeeper who is willing to falsify records for the employer's dishonest purposes may have less resistance than others to the temptation to secure similar unlawful advantage for himself. Proof that he embezzled some small items may warrant an inference that he was the sole wrongdoer, but it does not make incredible all of the direct and circumstantial evidence of the taxpayer's wrongdoing.

The taxpayer next refers to his testimony, supported by that of his wife and one of his employees, that he voluntarily produced the cash book and gave it to the revenue agent, from which he argues that the Tax Court was required to draw the inference that the taxpayer was not informed of the discrepancies between the cash book and the journal.

The testimony, if believed, would support the inference. Neither the accountant who, without audit, prepared the tax returns nor the revenue agent had seen the cash book until the revenue agent's examination approached completion. The revenue agent had gone far enough to suggest, tentatively, deficiencies totalling approximately $8,600.00, a relatively small amount. To this suggestion, the taxpayer says he objected. During the course of the discussion, he says he stated his cash book would prove he owed no additional tax and, thereupon, he produced the book. Since the cash book made apparent the fictitious nature of many entries in the journals, it was the key that opened the door to further inquiry and to the fraud charge. If the taxpayer knew of the discrepancies between the cash book and the journal, it would have been an unreasoned thing to have done what he says he did.

The Tax Court, however, was not obliged to accept this testimony. Aside from the improbabilities which inhere in it,[3] there was the testimony of the rev-

**2.** The bookkeeper testified that the taxpayer got all of the money and that he took none.

**3.** How the taxpayer could have thought the cash book could prove he owed no tax, is not apparent.

.enue agent. That official testified at the trial that he had not seen the cash book until his routine examination was complete, but he had no present recollection about how the cash book came into his possession. Shown an affidavit he had executed at a time more nearly contemporaneous with the event, he stated the affidavit was correct. In the affidavit he had sworn that he found the cash book in a safe in the taxpayer's office [4] and that the taxpayer had not given it to him.[5]

The Tax Court found support for its finding in the fact that the taxpayer entered his safety deposit box in a bank on the afternoon of the day the agent requested a joint inventory of the box. The taxpayer accumulated large sums in currency and the amount of it was particularly important to a net worth investigation. The taxpayer said he was unable to leave his office when the request was made, but agreed to go with the agent on the agent's next workday, a Monday. Within an hour after the agent left for the day on Friday, the taxpayer entered his deposit box. When he, with the agent, again entered the box on Monday, no currency was in it.

The taxpayer offered a reason, though one of no apparent urgency, for his entry. and testified that he had stopped keeping currency in his deposit box because his wife had access to it. Such explanations may modify the force of the adverse inference to be drawn from the entry, but they do not destroy it.

Along other byways the parties hotly contest the inferences to be drawn from particular facts.

A computation of the bookkeeper's net worth, the Commissioner contends supports the bookkeeper's testimony that he did not receive or take anything except his salary. The same computation convinces the taxpayer there must have been some supplementation of his salary. To the Commissioner, the fact that the bookkeeper has never been charged with embezzlement, or any other crime, raises one inference, but, to the taxpayer, justifies none. The fact that certain unreported receipts were in the form of checks which were endorsed by the bookkeeper, seems to the taxpayer compelling proof of embezzlement, but, under the circumstances, the Commissioner does not draw the same inference from the evidentiary fact.

■ All of this only emphasizes the factual nature of the question. Particular facts, the ultimate inference and collateral inferences along the way were all disputed. The issue was one of fact, and the Tax Court's resolution of it was not clearly erroneous.

Choosing between permissible inferences is a selective process. When the choice is made by the tribunal whose duty it is to make the choice, it does not mean, as the taxpayer suggests, that alternative inferences were ignored or that evidence which might have supported some other finding of subordinate fact was disregarded. Its findings and opinion make it plain that here the Tax Court did neither. What it said bears every indication of a fair and objective approach to its fact-finding duty.

■ The taxpayer complains that the Tax Court, which found his testimony less credible than that of his bookkeeper, took note of the taxpayer's conviction, upon a plea of nolo contendere, of having filed fraudulent income tax returns for the years 1944 through 1946. Again, the taxpayer attempts to explain the plea, but the Tax Court clearly had the right to consider the conviction when called upon to determine the credibility of the taxpayer's testimony in the light of the conflicting testimony of the bookkeeper and the other evidence.[6] Fear of im-

4. This was a safe used by the taxpayer for his personal purposes.

5. The taxpayer contends, erroneously, that this was the use of an ex parte affidavit as evidence.

6. Masters v. Commissioner, 3 Cir., 243 F. 2d 335; Kilpatrick v. Commissioner, 5 Cir., 227 F.2d 240.

prisonment when indicted in a district other than that of his residence is not a satisfying explanation of the plea, but it is the conviction, not the plea, which is properly used to impeach the witness. It was so used here and there was no error in the Tax Court's advertence to it.

With respect to the year 1946, the taxpayer contends that receipts from a storage garage should have been attributed to one of his corporations, rather than to him, and that payment by the corporation of payables accrued at the time of incorporation gave him the right to deduct them on his individual return.

When, in 1946, the taxpayer incorporated his taxi business, he retained individual ownership of a storage and parking garage which also served as a base of operations for the taxicab company. The taxicab company, without a lease, was permitted to use the garage for its purposes. Rental receipts from the general public for parking and the storage of cars were run through the books of the cab company and then withdrawn by the taxpayer.

■ Since there was no lease and the cab company paid no rental for the building, the Tax Court was justified in finding the parking and storage receipts to be receipts of the taxpayer, not of the corporation.

This cash basis taxpayer, when he incorporated his business, transferred to the new corporation miscellaneous assets and liabilities, including accounts payable, of some $7,144.98. To the extent these payables arose out of the business they should be deductible by someone, but the taxpayer, an individual on the cash basis, is met with the objection that he did not pay them.

■ Perhaps he could have provided for the payment in due course of these payables by the corporation as his agent, but he did not do that. What he might have done is not so important as the fact that he did not commit himself at the time. To reserve the right, after the event, advisedly, if advised at all, to attribute the deduction to the corporation or to its sole stockholder, offends notions of justice in taxation. That one or the other should be allowed to claim the deduction, therefore, does not require the conclusion that the individual cash basis taxpayer, who chose to transfer the obligation without payment, is now entitled, as a matter of law, to claim what he did not then claim unequivocally.[7]

The Tax Court's findings are supported by the evidence. We find no error of law.

Affirmed.

---

7. See Citizens National Trust & Savings Bank v. Welch, 9 Cir., 119 F.2d 717.