Aderienne M. Roenstad v. Commissioner.
Roenstad v. Commissioner
Docket No. 4038-63.
United States Tax Court
T.C. Memo 1965-32; 1965 Tax Ct. Memo LEXIS 299; 24 T.C.M. (CCH) 179; T.C.M. (RIA) 65032; February 17, 1965
*299 Held: (1) In determining petitioner's taxable income adjusted under the net worth method the cash on hand at the end of each of the years 1956, 1957, 1958, and 1959 was $22,000, $16,600, $8,400 and $1,500, respectively; (2) A part of the underpayment of tax required to be shown on petitioner's returns for each of the years 1957, 1958, and 1959 was due to fraud; and (3) Assessment of the deficiency in tax for the year 1958 is not barred by the statute of limitations. John H. Kennett, Jr., 318-A 2nd St., Roanoke, Va., for the petitioner. Douglas O. Tice, Jr., for the respondent. ARUNDELL
Memorandum Findings of Fact and Opinion ARUNDELL, Judge: Respondent determined deficiencies in income tax and 50 percent additions to tax for the calendar *300 years 1957, 1958 and 1959 in amounts as follows: Year
Deficiency
Addition
1957
$1,997.09
$ 998.55
1958
7,074.37
3,537.19
1959
3,856.08
1,928.04
By an amendment to answer to petition respondent claims an increased deficiency and an increased addition for 1959 of $685.16 and $342.58, respectively. The issues for our decision are: 1. Whether the use of the net worth method of computing petitioner's adjusted gross income was justified and whether the computation of the adjusted gross income as modified was correctly made by respondent for the years 1957, 1958, and 1959. 2. Whether petitioner is liable for the 50 percent addition under section 6653(b), Internal Revenue Code of 1954, for the taxable years 1957, 1958, and 1959. 3. Whether assessment of the deficiency for the taxable year 1958 is barred by the statute of limitations (sec. 6501, I.R.C. 1954). Findings of Fact Some of the facts were stipulated and such facts are incorporated herein by reference. Petitioner filed Federal income tax returns for the calendar years 1957, 1958, and 1959 with the district director of internal revenue at Richmond, *301 Va. Petitioner was born in 1907. In the late 1920's she began working as a prostitute and was so employed for several years at various houses of prostitution in Virginia, West Virginia, and North Carolina. In 1935 petitioner acquired a house located at 906 Fourth Street, Lynchburg, Va. Petitioner operated a house of prostitution at this location from 1935 through 1963, through not necessarily continuously. She carried on operations at this house during certain portions of the taxable years 1957, 1958, and 1959, although the house was being remodeled during most of 1957. Because of her several marriages petitioner has used various names; however, she has generally been known in Lynchburg as Frances Clayes. Prices for "dates" at petitioner's house on Fourth Street during the taxable years varied from $5 to as high as several hundred dollars. Most payments for "dates" were received in cash although some payments were by personal checks made payable to cash. During the taxable years petitioner employed from one to five girls as prostitutes at the Fourth Street address. While working for petitioner these girls lived at the house, and petitioner furnished their room and board. A *302 fee received by a girl for a "date" was divided equally between the girl and petitioner. To a limited extent during the taxable years petitioner received some income from the sale of alcoholic beverages and soft drinks. The price was $1 a drink for whiskey and beer and 50 cents for soft drinks. When a patron desired a drink petitioner would have to send someone out for it. During the taxable years petitioner kept no books or records of her operations at the Lynchburg house. Petitioner employed a certified public accountant to prepare her Federal income tax returns for the taxable years here involved. On these returns petitioner reported, among other things, "rental" income received from the Lynchburg property, adjusted gross income, and taxable income or (loss) as follows: Adjusted
Taxable In-
Lynchburg
Gross In-
come or
Year
"rents"
come
(loss)
1957 $160
$2,618.49
($ 197.17)
1958
480
810.18
( 1,670.84)
1959
"Approx. 800"
2,011.29
( 1,589.84)
Petitioner's income tax returns for the taxable years here involved were the subject of an investigation by agents of the respondent beginning in August 1959. As a result of this investigation, *303 petitioner was prosecuted in the Federal District Court for the Western District of Virginia for attempting to evade and defeat her Federal income tax for the years 1957, 1958, and 1959. After an initial plea of not guilty, petitioner changed her plea to nolo contendere and was found guilty. In determining the deficiencies herein, respondent computed petitioner's taxable income by the net worth method. A summary of these computations as disclosed in a statement attached to the deficiency notice is as follows: Net Worth Statement
Assets:
12-31-56
12-31-57
12-31-58
12-31-59
Cash on hand
None
None
None
None
Cash in banks
$ 3,039.40
$ 8,578.22
$ 2,620.04
$ 2,446.86
Notes Receivable
None
47,215.00
47,215.00
51,682.30
Automobiles
5,499.00
5,499.00
6,220.00
6,220.00
Real Est. & Furn.
51,324.24
19,451.43
35,827.13
53,645.43
Total Assets
$59,862.64
$ 80,743.65
$ 91,882.17
$113,994.59
Less Liabilities and Depreciation
19,481.91
7,506.20
4,160.46
16,856.53
Net Worth
$40,380.73
$ 73,237.45
$ 87,721.71
$ 97,138.06
Less net worth at end of preceding year
40,380.73
73,237.45
87,721.71
Increase in net worth
$ 32,856.72
$ 14,484.26
$ 9,416.35
Net adjustments
(25,205.60)
4,898.05
3,225.70
Taxable Income Adjusted
$ 7,651.12
$ 19,382.31
$ 12,642.05
*304 A correct net worth statement follows: Correct Net Worth Statement
Assets:
12-31-56
12-31-57
12-31-58
12-31-59
Cash on hand
$22,000.00
$ 16,600.00
$ 8,400.00
$ 1,500.00
Cash in banks
3,039.40 *
8,578.22 *
2,492.17
2,446.86 *
Notes Receivable
None *
47,215.00 *
47,215.00 *
51,659.23
Automobiles
2,344.00
2,344.00
6,944.00
6,944.00
Real Est. & Furn
58,673.59
25,800.78
35,904.33
55,591.19 #
Total Assets
$86,056.99
$100,538.00
$100,955.50
$118,141.28
Less Liabilities and Depreciation
19,481.91 *
7,506.20 *
4,160.46 *
16,856.53 *
Net Worth
$66,575.08
$ 93,031.80
$ 96,795.04
$101,284.75
Less Net Worth at end of preceding year
66,575.08
93,031.80
96,795.04
Increase in Net Worth
$ 26,456.72
$ 3,763.24
$ 4,489.71
Net Adjustments
(24,750.24)
5,000.00
2,825.70
Taxable Income Adjusted
$ 1,706.48
$ 8,763.24
$ 7,315.41
A part of the underpayment of tax required to be shown on petitioner's return for each of the years 1957, 1958, and 1959 was due to fraud. For *305 those years petitioner filed false and fraudulent returns with the intent to evade tax. Opinion Because petitioner kept no books or records of her operations at the Lynchburg house, respondent was forced to resort to the so-called net worth method of determining petitioner's income for the years in question. The resort to this method was proper. Holland v. United States, 348 U.S. 121; Hargis v. Godwin, 221 F. 2d 486, 491 (C.A. 8, 1955). A summary of these computations is in our findings. It will be noted from these computations that the respondent did not include anything for "Cash on hand" at the end of the years 1956 through 1959. At the hearing the parties stipulated the correct amounts of all the assets, liabilities and adjustments shown in the respondent's net worth statement except the "Cash on hand." These "correct amounts" are all shown in the correct net worth statement set out in our findings. It may be noted that except for the asset automobiles for all years and real estate and furniture for December 31, 1956 and 1957, the correct amounts do not vary substantially from the amounts determined by the respondent. Counsel for petitioner in *306 his opening statement said, "In effect the only thing to be tried is the cash flow" meaning the cash on hand at the end of each of the years 1956 through 1959. In their briefs the parties now contend that from all the evidence we should find the cash on hand at the close of each of the years involved in amounts as follows: Petitioner's
Respondent's
Date
Contention
Contention
Dec. 31, 1956
$39,000
$3,500
Dec. 31, 1957
32,000
3,500
Dec. 31. 1958
15,000
3,500
Dec. 31, 1959
None
3,500
Under the respondent's contention the effect of the one item "Cash on hand" would produce no increase or decrease in petitioner's net worth for any of the taxable years here involved. Under the petitioner's contention, the effect of the one item "Cash on hand" would be a decrease in petitioner's net worth for the calendar year 1957 of $7,000 ($39,000 minus $32,000), for 1958 of $17,000, and for 1959 of $15,000. As will be explained later, we have found from all the evidence that the cash on hand at the close of each of the years 1956 through 1959 was $22,000, $16,600, $8,400 and $1,500, respectively, and have inserted these amounts in the correct net worth statement *307 set out in our findings. The evidence as to the amount of cash on hand at any time consisted principally of petitioner's own testimony and the testimony of several other witnesses who testified they saw some of the money petitioner claims she had. A brief summary of petitioner's testimony is that prior to 1941 petitioner had accumulated from her early operations a cash hoard of $100,000; that she buried this money in a glass jar in the basement of her house at 906 Fourth Street; that she was sent to the penitentiary in 1941; that just prior there to she dug up the money and gave her sister $7,000 to look after things while she was away; that she reburied $93,000; that while in the penitentiary the house was sold; that on October 16, 1944, after she had been released from the penitentiary she reacquired the house and shortly thereafter dug up the $93,000 and place it in a butter crock; that in 1951 she married Andrew J. Roenstad and moved to Ledgewood, N.J.; that she used some of the money to buy property in New Jersey; that in 1954 she left $75,000 with a friend in New Jersey for safekeeping who locked it up for her in a gun closet; that in 1955 the friend returned the $75,000 *308 to petitioner; that petitioner took the money and went to Florida and purchased property in Florida; that late in 1956 she came back to Lynchburg with $50,000 in cash and put it in the crock; that some time in 1957 she counted the money in her crock and found it to be $43,000; that about September 1958 she went to Florida and did not return until she obtained a divorce from Roenstad in March 1959; that while in Florida she bought some more real estate; that after she returned from Florida in 1959 she had $15,000 or $20,000; and that at the end of 1959 she had less than $2,000. In August 1959, Charles D. Bryant, a special agent with the Intelligence Division of the Internal Revenue Service commenced investigating petitioner's income tax liability for the years in question. Petitioner did not tell Bryant about the alleged cash hoard. In fact, she first told him that she had no cash on hand prior to or during the taxable years in question. Later she told Brant that a dying freind, Thomas Raymond Turner, had given her $41,000 in the early 1950's but later she told him the gift was only $4,100. She also told Bryant that another man, Mezzanotte, had given her approximately $10,000 in the *309 1940's Another story given Bryant by petitioner was that when she went to the penitentiary in 1941 she gave Bill Coffey $3,600 to keep for her and that this $3,600 hadd been returned to her "in a piece-meal fashion in about the mid-1950's, extending through 1956 and possibly into 1957." After Bryant had testified concerning these stories he was interrogated by the Court as follows: THE COURT: Well, did she tell you anything about having money in a crock that was buried under the coal? THE WITNESS: No, sir. THE COURT: You never heard of it at any time during the investigation? THE WITNESS: Today is the first time I have heard of the crock or any other storage. We think some answer must be found as to why petitioner did not tell Bryant about the $93,000 she claims she dug up in the basement of her reacquired house in Lynchburg in 1944 and as to why petitioner did not offer any testimony before this Court of the stories she told Bryant regarding Turner, Mezzanotte, and Coffey. Petitioner had the burden of proving that she had a cash hoard and no substantial income during 1957, 1958, and 1959. Rice v. Commissioner, 295 F. 2d 239 (C.A. 5, 1961), affirming per *310 curiam a Memorandum Opinion of this Court. In weighing the evidence we cannot overlook the self-serving declarations of petitioner, and the close family relationship and friendship between petitioner and her several witnesses. Petitioner was convicted in 1946, 1950, and 1964 for operating a house of prostitution, in 1941 for violation of the Mann Act, and in 1962 for criminal tax fraud based on charges pertaining to the years in issue. Petitioner had entered a plea of nolo conlendere on the tax evasion charges. Her most recent arrest and conviction for operating a house of prostitution occurred while she was still under probation from the criminal tax conviction. All of these convictions bear on petitioner's credibility as a witness. Lillian Kilpatrick, 22 T.C. 446, 454, affd. 227 F. 2d 240 (C.A. 5, 1955); Masters v. Commissioner, 243 F. 2d 335, 338 (C.A. 3, 1957), affirming 25 T.C. 1093; Doggett v. Commissioner, 275 F. 2d 823, 826 (C.A. 4, 1960), affirming a Memorandum Opinion of this Court. In view of these convictions we are therefore justified in not giving full weight to some of petitioner's statements. Even *311 if we accept petitioner's testimony as substantially true that she dug up $93,000 in 1944, we are not convinced by her testimony that these funds had not been substantially dissipated or converted into other assets by December 31, 1956, over 12 years later. It has been stipulated by the parties that on December 31, 1956, petitioner owned total assets, exclusive of any cash on hand, of $64,056.99. The parties have also stipulated that on December 31, 1957, 1958, and 1959, petitioner owned total assets, exclusive of any cash on hand, of $83,938, $92,555.50, and $116,641.28, respectively. We are satisfied that some portion of this increase in assets was due to a further conversion of the original hoard but we believe that the evidence shows that a great portion was due to amounts petitioner received from the girls she had working for her during the years 1957, 1958, and 1959. The parties have stipulated as to what seven different patrons, designated by letter only, from "Mr. A" to "Mr. G," inclusive, if present in Court, would testify. We mention as a sample the stipulation pertaining to Patron G, which is as follows: That a witness, Mr. "G", if present in court at the trial of this *312 case, would testify that a check drawn by him on April 8, 1959, payable to "cash" in the amount of $200.00 was for an overnight "date" with a girl at petitioner's house at 906 Fourth Street, Lynchburg, Virginia, and that a check dated September 2, 1958, payable to "cash" in the amount of $450.00 was for the same purpose; that although he may have had a drink or two provided to him on those occasions, he paid nothing extra for them; that the blank checks were provided to him by the girls he was "dating", and that he filled them out sometime during the night; the price of the "dates" was always given to him by the girl he "dated" and not by petitioner; that he went to petitioner's house several times during 1957, 1958, and 1959, and there were from one to four or five girls to choose from on different occasions. Respondent also offered the testimony of a girl who worked for petitioner 10 to 14 days, or 3 weeks at the most, during 1958 and who testified that during that period she took in as payment for dates "approximately $3,000, of which I received $1,500." She also testified that while she was there she considered business to be good and that there were many customers coming. *313 Thus we are convinced that petitioner realized considerably more from the operations of her Lynchburg house than the small amounts of "rent" she reported in her tax returns. Since the only way petitioner's taxable income can be determined from the record is by the net worth method and since the parties have stipulated the correct amount of all assets (except cash on hand), liabilities and adjustments, it follows that once we find what the amount of cash on hand was on each of the four crucial dates, December 31, 1956, 1957, 1958, and 1959, it remains merely a matter of mathematical computation to determine the taxable income adjusted. The respondent now concedes that he was in error in determining that petitioner had no cash on hand on any of these four dates. He requests that we find from the evidence that she had $3,500 cash on hand on each of the four dates. Petitioner claims the evidence shows $39,000 on December 31, 1956, $32,000 on December 31, 1957, $15,000 on December 31, 1958, and not any on December 31, 1959. We have previously pointed out why it is impossible to accept petitioner's testimony at full face value. We do, however, believe that she had a substantial amount *314 of cash on hand on December 31, 1956, practically all of which she used to acquire more property during the taxable years in question. We do not, however, believe it was $39,000 as petitioner contends. We are convinced, however, after carefully weighing the testimony of all the witnesses on both sides and after careful consideration of the entire record including the large amount ($64,056.99) of admitted assets (other than cash on hand) owned by petitioner on December 31, 1956, that the cash on hand on the four crucial dates was, and we so find, as follows: December 31, 1956
$22,000
December 31, 1957
16,600
December 31, 1958
8,400
December 31, 1959
1,500
From this finding it automatically follows that petitioner's taxable income adjusted for the three taxable years of 1957, 1958, and 1959 is $1,706.48, $8,763.24, and $7,315.41, respectively. As shown in our findings, petitioner had reported losses for all three years. Fraud. - In order to prove fraud by clear and convincing evidence the respondent does not have to prove that all of the deficiency for each year is due to fraud. All the statute [1] requires for each year is that "if any part of any underpayment *315 * * * of tax required to be shown on a return is due to fraud" then the 50 percent addition should apply. We think the respondent has met his burden by clear and convincing evidence that a part of the underpayment of tax for each year was due to fraud with intent to evade tax. He has established that instead of the losses shown on the returns petitioner had substantial taxable income. He has proven the probable source of that income. The repeated and systematic failure to report substantial amounts of income by a competent person over several consecutive years, as shown here by the correct net worth statement set out in our findings, is strong and adequate evidence of fraud. [2]
*316 We hold, therefore, that the respondent has sustained his burden as to the fraud issue for all years. Statute of Limitations. - Having found that petitioner filed false and fraudulent returns with intent to evade tax for all of the years here in question, it follows that the assessment of the deficiency in tax for the year 1958 is not barred by the statute of limitations. Sec. 6501(c)(1), I.R.C. 1954. Decision will be entered under Rule 50. Footnotes
*. Indicates no change from original determination by respondent. ↩
#. Includes $1,594.75 for appliances and $1,585.75 for a trailer.↩
1. Sec. 6653(b), I.R.C. 1954↩.
2. See Fotland v. United States, supra; Morris Lipsitz, 21 T.C. 917, 936, aff'd. 220 F. 2d 871 (C.A. 4, 1955); certiorari denied 350 U.S. 845; William G. Lias, 24 T.C. 280, 309, 319, aff'd. 235 F. 2d 879 (C.A. 4, 1956), certiorari denied 353 U.S. 935; J. K. Vise, 31 T.C. 220, aff'd. 278 F. 2d 642 (C.A. 6, 1960); Masters v. Commissioner, supra; and Cefalu v. Commissioner, 276 F. 2d 122↩ (C.A. 5, 1960), affirming a Memorandum Opinion of this Court.