Rosalie Lala Reyer, et al. [1] v. Commissioner. Reyer v. Commissioner
Docket Nos. 82012-82014, 82068.
United States Tax Court
T.C. Memo 1962-240; 1962 Tax Ct. Memo LEXIS 68; 21 T.C.M. (CCH) 1276; T.C.M. (RIA) 62240; October 10, 1962
*68 Held, petitioners Rosalie Lala Reyer and George Reyer had no unreported, taxable income from the partnerships 407, Monticello, Pat's or Riverview Clubs during the taxable years 1948 through 1951. Held, further, they did not sustain a loss of $11,345, during the taxable year 1949 in the operation of the Alton and Reyer partnership. Held, petitioners Francis B. and Josie Mills had no unreported, taxable income from the partnerships 407, Monticello, Pat's, Riverview or New Crescent Clubs during the taxable years 1948 through 1952. Albert B. Koorie, Esq., Carondelet Bldg., New Orleans, La., for the petitioners. Roy E. Graham, Esq., for the respondent. ARUNDELL
Memorandum Findings of Fact and Opinion ARUNDELL, Judge: Respondent determined deficiencies in income tax and additions to the tax under the 1939 Internal Revenue Code for calendar years and in amounts as follows: Docket
Addition to Tax
Petitioner
No.
Year
Deficiency
294(d)(1)(A)
294(d)(2)
Rosalie Lala Reyer
82012
1948
$ 83,144.00
George Reyer
82013
1948
83,144.00
George Reyer and Rosalie Lala Reyer
82014
1949
169,722.48
George Reyer and Rosalie Lala Reyer
82014
1950
202,938.54
$18,217.33
$12,144.88
George Reyer and Rosalie Lala Reyer
82014
1951
160.23
204.48
136.32
Francis B. Mills and Josie Mills
82068
1948
167,108.10
Francis B. Mills and Josie Mills
82068
1949
168,891.90
Francis B. Mills and Josie Mills
82068
1950
215,494.34
12,894.56
Francis B. Mills and Josie Mills
82068
1951
6,812.10
Francis B. Mills and Josie Mills
82068
1952
10,317.30
*69 The only issue remaining for decision is whether petitioners, during the taxable years here involved, received unreported gambling income from several partnerships in which they were members. All of the other issues assigned have been agreed upon and effect will be given to such agreements in the recomputations to be made under Rule 50. Findings of Fact The stipulated facts are so found and are incorporated herein by this reference. Petitioners George Reyer and Rosalie Lala Reyer are husband and wife with residence in New Orleans, Louisiana. They filed separate returns for 1948 and joint returns for 1949, 1950, and 1951. The returns were filed with the then collector of internal revenue for the district of Louisiana. Petitioners Francis B. Mills (also known as Frank Mills, F. B. Mills, Frank B. Mills, and F. Mills) and Josie Mills are husband and wife with residence in Metairie, Louisiana. They filed joint returns for the years 1948 through 1952 either with the then collector or the present director of internal Revenue for the district of Louisiana. The 407 Club
The 407 Club was a partnership involved in off-track betting on horses in Louisiana. Petitioners George Reyer *70 and Francis B. Mills were partners in the 407 Club for the period May 1, 1947, through March 11, 1950, each owning a 33 1/3 percent interest in the Club. The partnership was on a fiscal year basis ending April 30. Peter J. Pizzo was its bookkeeper. George Brouphy was the manager. Brouphy died sometime in November 1952. Petitioners George Reyer and Francis B. Mills took no active part in the operation or management of the Club. Pizzo prepared and filed the partnership returns of income of the 407 Club for the fiscal years ended April 30, 1948, April 30, 1949, and the final return for the period May 1, 1949, through March 11, 1950. These returns showed a net loss of $51,148 for fiscal 1948, a net income of $76,123.30 for fiscal 1949 and a net loss of $30,098.85 for the final return. The partners' shares of these losses and income were shown on the returns as follows: Fiscal 1948
Fiscal 1949
Final
George Reyer
($17,049.34)
$25,374.44
($10,032.95)
Francis B. Mills
( 17,049.33)
25,374.43
( 10,032.95)
Alton Mills, Sr.
( 17,049.33)
25,374.43
( 10,032.95)
($51,148.00)
$76,123.30
($30,098.85)
The losses and income shown on the above returns were *71 taken from the permanent records made and kept by Pizzo. The bookkeeping system used by the 407 Club was a system commonly in use by establishments of this kind and consisted of several consecutive steps. The first step dealt with the so-called 20-line sheets. These sheets were memoranda of the bets as they were made and were prepared by 10 or 12 sheet writers. Each blank sheet had attached thereto 20 blank, printed tickets on which, as the bets were made, the sheet writer would record on the ticket the number of the horse, the amount of money bet on the horse, and whether it was to win, place, or show. A double carbon was made of this record so that the sheet writer had a carbon copy of the bet on his 20-line sheet and a reverse copy appeared on the back of the ticket that was then torn off of the 20-line sheet and handed to the bettor. The purpose of the reverse copy was to show up any forgery that a bettor might later try to make. If the horse won, the bettor would go to the cashier and collect but, if the horse lost, he would usually destroy the ticket. After a sheet writer had completed a sheet of 20 bets, he would turn the retained carbon copy of the sheet, together with the *72 money taken in, over to Pizzo who would verify it and take the sheet and the money to one of the cashiers who would enter on the sheets, after the race had been run, the amount of the winning ticket and place a circle around the amount as the bets were paid to show that he had paid the amount. Each cashier kept for himself as a memorandum a cashier's worksheet, for each race track and for each race, which showed (1) the number of horses in a race, (2) which horse won the race, (3) which horse ran second, (4) which horse ran third, (5) the winning pari mutuel, (6) the place pari mutuel, and (7) the show pari mutuel. At the end of the day, Pizzo and Brouphy checked out each of the cashiers and no cashier could leave the establishment until he had been checked out. Sometimes the cash would not check out exactly. If the difference was small (up to $40) it would be recorded either as an over or a short but, if the difference was large, the cashier would have to remain until the difference was located. After the cashiers had all been checked out, Pizzo would make up a so-called daily summary sheet. This was the second step in the bookkeeping system and was a part of the permanent records *73 of the Club. Representative of such a daily summary sheet of Club 407 is the daily sheet of July 4, 1949, which is as follows: DATE 7-4-49
INS
OUTS
Teddy
9 054
10 505 60
Sch
7 343
8 561 45
L P
1 811
2 625 70
B P
23 603
40 399 40
Lan
24 541
39 124 75
Ex 154 50
Sh 91 00
66 352
101 462 40
66 352 00
Lose 35 110 40
Teddy, Sch and Lan, shown on the above summary sheet, represented the three cashiers who were on duty at the Club on July 4, 1949, whose names were Teddy, Schmidt, and Landrien. The L.P. stood for "little parley" and B.P. for "big parley." The term "Ex" stood for expense and "Sh" for shortage. The "Ins" represented gross bets received and the "Outs" represented the payments to the winning bettors. A correct and accurate transcript of these daily summary sheets of Club 407 for the period May 1, 1947, through March 11, 1950, has been made and stipulated as Exhibit 22-V and shows, for each month except the months of May, June, July, and August of 1947, in columnar form (7 columns) for each day of the month, the Ins, Outs, Gambling Net, Expenses, Salaries, Over or (Short), and Net Win or ("Lose"). Representative *74 of Exhibit 22-V is July 4, 1949, which is as follows: Ins
$ 66,352.00
Outs
101,216.90
Gambling Net
(34,864.90)
Expenses
154.50
Salaries
None
Over or (short)
(91.00)
Net Win or ("lose")
(35,110.40)
The 4 months of May, June, July, and August, 1947, of Exhibit 22-V did not show the information in the first six columns but only the "Net win or ('lose')" of the seventh column. For these four months the total net wins and the total net losses are as follows: No. of
No. of
Month in 1947
Days
Net Wins
Days
Net Losses
May (4 Sundays)
17
$45,081.00
10
$25,214.15
May (Club Forest)
673.20
June (5 Sundays)
14
37,841.20
11
32,257.00
June (Club Forest)
1,396.05
July (4 Sundays)
11
52,144.75
16
84,590.45
Aug. (5 Sundays)
16
44,816.20
10
58,868.50
As a part of his determination, the respondent disallowed in full the daily net losses for these 4 months of $25,214.15, $32,257, $84,590.45 and $58,868.50. The third step in the bookkeeping system of Club 407 was the daily posting by Pizzo from the daily summary sheets to the ledger sheets of the net win or the net loss. The 20-line sheets (step 1) *75 were kept for 30 or 60 days and were then destroyed because they became too cumbersome and bulky to store. The daily summary sheets (step 2) were retained (except for the months of May, June, July, and August of 1947) as a permanent record of Club 407 and contained in summary form all of the information that had been recorded on the 20-line sheets. A recapitulation of the three steps in the bookkeeping system of Club 407 for the period from May 1, 1947, through March 11, 1950, shows the net wins or (net losses) by months for the fiscal years ended April 30, 1948, April 30, 1949, and the period ending March 11, 1950, as follows: Period End-
Fiscal
Fiscal
ing March
Month
1948
1949
11, 1950
May
$19,193.65
$36,204.15
($81,245.80)
June
4,188.15
(13,522.05)
42,651.95
July
(32,445.70)
(8,863.35)
15,848.50
August
(14,052.30)
(81,607.75)
38,248.15
September
(56,513.90)
79,366.15
1,211.25
October
(33,906.20)
(16,122.90)
10,946.25
November
(38,727.00)
4,898.95
16,013.15
December
1,235.35
29,396.20
14,169.65
January
49,720.85
25,681.85
(15,934.40)
February
31,981.80
7,237.05
(50,948.45)
March
23,389.45
7,657.00
(23,818.50)
April
(5,212.15)
5,798.00
($51,148.00)
$76,123.30
($32,858.25) *
*76 For the fiscal year ended April 30, 1948, the respondent determined that, instead of a loss of $51,148, the partnership (Club 407) had a net income for that year of $652,261.68. For the fiscal year ended April 30, 1949, the respondent determined that instead of a net income of $76,123.30, the partnership (Club 407) had a net income for that year of $743,344.62. For the period May 1, 1949, through March 11, 1950, the respondent determined that instead of a net loss of either $30,098.85 (as reported on the partnership return) or $32,858.25 (as shown by the permanent records of the partnership), the partnership (Club 407) had a net income for that period of $726,264.78. The respondent arrived at the above amounts of net income by disallowing all the losses on those days which resulted in a net loss for the day after deducting expenses. He allowed as deductions all the expenses claimed by the partnership. He did not disallow any of the losses on those days which resulted in a net win for the day. The total "Ins" and "Outs," exclusive of expenses, salaries, overs *77 and shorts, of Club 407, and the difference between the two, for the last 8 months of the fiscal year ended April 30, 1948, the fiscal year ended April 30, 1949, and the period May 1, 1949, through March 11, 1950, is as follows: Ins
Outs
Difference
Last 8 months of fiscal 1948
$ 6,313,341.25
$ 6,207,733.70
$105,607.55
Fiscal year April 30, 1949
11,354,987.50
11,095,810.85
259,176.65
Period ending March 11, 1950
10,264,966.40
10,106,508.45
158,457.95
Club 407 was located in the Club Forest Building and Club Forest was to receive as rental 25 percent of the winnings of Club 407. In March 1950, Club 407 was put out of the Club Forest Building by Club Forest because Club Forest was not receiving sufficient rental out of the operation of Club 407. Monticello Club The Monticello Club was a partnership involved in off-track betting on horses in Louisiana. Petitioners George Reyer and Francis B. Mills were partners in the Monticello Club for the period January 1, 1948, through May 12, 1948, each owning a 25 percent interest in the Club. The two other partners were Alton Mills and Salvadore J. Gallo, who were the co-managers of the Club. Gallo was *78 present at the Club every day. While Alton, who was the son of petitioner Francis B. Mills, was a co-manager he was more or less Gallo's helper. Petitioners George Reyer and Francis B. Mills took no active part in the operations of the Monticello Club. The Monticello Club was conducted in very much the same way as Club 407. It employed the same system of bookkeeping as was used by Club 407. Pizzo was also the bookkeeper of the Monticello Club but only came in once a week. Gallo was the person who checked the cashiers and sheet writers every day. A correct and accurate transcript of the daily summary sheets of the Monticello Club for the period January 1 through May 12, 1948, has been made and stipulated as Exhibit 23-W, and shows for each month the following: Expenses
and Other
Net Wins or
Month
Ins
Out
Deductions
(Net Losses)
January
$ 353,474.00
$ 333,780.70
$ 8,747.25
$10,946.05
February
469,176.00
444,395.75
7,754.85
17,025.40
March
460,981.50
461,589.45
10,458.25
(11,066.20)
April
408,352.00
410,897.10
8,417.25
(10,962.35)
May
81,851.15
73,772.10
3,862.30
4,216.75
$1,773,834.65
$1,724,435.10
$39,239.90
$10,159.65
*79 Pizzo prepared and filed a partnership return of income for the Monticello Club for the period January 1 through May 12, 1948, and reported a net income for that period of $10,159.65. Both petitioners George Reyer and Francis B. Mills in their individual returns for the calendar year 1948 reported $2,539.91 as being their share of the profit shown on the partnership return. As in Club 407, the 20-line sheets of the Monticello Club were kept for 30 or 60 days and were then destroyed because they became too cumbersome and bulky to store. For the period January 1 through May 12, 1948, the respondent determined that instead of a net income of $10,159.65 as reported on the partnership return and as shown on the permanent records of the Club, the Monticello Club had a net income for that period of $141,885.12 and that each partner's share thereof was $35,471.28 instead of the $2,539.91 reported by petitioners George Reyer and Francis B. Mills. The respondent arrived at the above amount of net income of $141,885.12 by disallowing all the losses on those days which resulted in a net loss for the day after deducting expenses. He allowed as deductions all the expenses claimed by the partnership. *80 He did not disallow any of the losses on those days which resulted in a net win for the day. The business of the Monticello Club was terminated on May 12, 1948, because the place at which it was being conducted was sold. Pat's Club Pat's Club was a partnership involved in off-track betting on horses, dice, and roulette operations in Louisiana. As far as the horse racing was concerned, it was in reality a continuation of Club 407 after the latter discontinued its operations in March 1950, but with new partners and the addition of the dice and roulette operations. Petitioners George Reyer and Francis B. Mills were partners in Pat's Club for the period June 19, 1950, to August 11, 1950. George Reyer and Francis B. Mills each owned an 18.18184796 percent interest in the Club during that period. As far as the horse racing was concerned, Pat's Club was run substantially the same as Club 407. Michel Vernacin was its cashier and bookkeeper. Petitioners George Reyer and Francis B. Mills took no active part in the management or operation of Pat's Club. For the period June 19, 1950, through August 11, 1950, Pat's Club had certain permanent records from which a correct and accurate *81 transcript has been made and stipulated as Exhibit 24-X and shows for each month the following: From Horse Racing
Expenses
and Other
Net Wins or
Month
Ins
Outs
Deductions
(Net Losses)
June 19-30
$ 700,570.00
$ 702,701.95
$1,169.25
$ (3,301.20)
June 19-30
Net win from dice
709.00
June 19-30
Net win from roulette
223.95
July
1,481,019.50
1,361,974.65
7,003.30
112,041.55
July
Net loss from dice
(11,757.00)
July
Net loss from roulette
(166.25)
Aug. 1-11
710,057.00
842,783.15
5,396.30
(138,122.45)
Aug. 1-11
Net loss from dice
(555.00)
Aug. 1-11
Net win from roulette
132.50
Over-all net loss from June 19 through August 11
[40,794.90)
For the period June 19, 1950, through August 11, 1950, Pat's Club filed a partnership return and reported a net loss for the period of $45,784.40. Petitioner George Reyer claimed a loss of $10,024 from Pat's Club in the joint return filed for the calendar year 1950. Petitioner Francis B. Mills claimed a loss of $8,324.45 from Pat's Club in the joint return filed for the calendar year 1950. The 20-line sheets of Pat's Club were kept for 30 or 60 *82 days and were then destroyed because they became too cumbersome and bulky to store. For the period June 19, 1950, through August 11, 1950, the respondent determined that instead of a net loss of $45,784.40 as reported on the partnership return filed for Pat's Club or the net loss of $40,794.90 as shown by the permanent records of the Club, Pat's Club had a net income for this period of $250,626.06 and that each of George Reyer's and Francis B. Mills' share thereof was $45,568.45 (18.18184796 percent of $250,626.06) instead of the losses reported by them in their returns. The respondent arrived at the above amount of net income of $250,626.06 by disallowing all the losses on those days which resulted in a net loss for the day after deducting expenses. He allowed as deductions all the expenses claimed by the partnership. He did not disallow any of the losses on those days which resulted in a net win for the day. The business of Pat's Club was discontinued on August 11, 1950, for the reason that on that day the Club suffered a loss of $67,297.60, wiping out its entire "bankroll" which compelled the Club to close its doors. Riverview Club The Riverview Club of Arabi, Louisiana, *83 was a partnership involved in some offtrack betting on horses but involved primarily casino operations. This Club was in operation from January 11, 1949, through December 31, 1949; from January 1, 1950, through January 7, 1950; from February 19, 1951, through March 20, 1951; from March 21, 1951, through April 29, 1951; and from May 4, 1951, through October 25, 1951. Petitioner George Reyer was a partner in the Riverview Club for the periods January 11, 1949, through December 31, 1949, and from January 1, 1950, through January 7, 1950, during which periods Reyer owned a 10 percent interest in the Club. Petitioner Francis B. Mills was also a partner in the Riverview Club. His interest ownership in the Club during the different periods was as follows: Interest
Period
Ownership
Jan. 11, 1949, through Dec. 31, 1949
10%
Jan. 1, 1950, through Jan. 7, 1950
10%
Feb. 19, 1951, through Mar. 20, 1951
10%
Mar. 21, 1951, through Apr. 29, 1951
20%
May 4, 1951, through Oct. 25, 1951
10%
During the above five periods the Riverview Club had certain permanent records from which correct and accurate transcripts have been made and stipulated as Exhibits 20-T and 21-U. *84 Exhibit 20-T is a transcript of the games book and Exhibit 21-U is a transcript of the expense book. Respondent has allowed all of the expenses. The transcript of the games book shows for each day in each period in columnar form the bank roll opening, the in, the out, win or (lose), expenses, net win or (net loss), over or (short) and the bank roll balance. A recapitulation of the ins, outs, expenses, net wins or (net losses) and over or (shorts) for each period is as follows: (Note: cents were disregarded if under 50 cents; if over 50 cents, amount was raised to the next dollar) January 11, 1949, through December 31, 1949
Net Wins or
Over or
Month
Ins
Outs
Expenses
(Net Losses)
(Short)
Jan.
$ 150,015
$ 116,310
$ 28,586
$ 5,119 $232
Feb.
241,323
206,865
45,571
(11,113)
(103)
Mar.
208,816
163,900
45,665
749
(12)
Apr.
236,115
196,310
49,628
(9,823)
40
May
204,263
163,973
50,466
(10,176)
37
June
199,383
163,451
40,145
(4,213)
(5)
July
219,148
185,258
40,573
(6,683)
4
Aug.
217,037
155,739
41,039
20,259
(10)
Sept.
184,058
156,286
46,648
(18,876)
48
Oct.
204,672
174,758
39,243
(9,329)
38
Nov.
74,373
67,782
17,263
(10,672)
(4)
Dec.
68,652
61,819
16,693
(9,860)
(1)
$2,207,855
$1,812,451
$461,520
[64,618) * $264
January 1, 1950, through January 7, 1950
Jan.
$ 11,389
$ 27,318
$ 3,008
[18,937)
(1)
February 19, 1951, through March 20, 1951
Feb.
$ 69,140
$ 68,413
$ 8,763
$ (8,036)
(8)
Mar.
101,904
114,786
21,170
(34,052)
(23)
March 21, 1951, through April 29, 1951
Mar.
$ 48,684
$ 43,172
$ 8,319
$ (2,807)
6
Apr.
158,183
143,955
24,561
(10,333)
(4)
May 4, 1951, through October 25, 1951
May
$ 223,485
$ 183,356
$ 37,881
$ 2,248
(36)
June
253,863
227,125
39,518
(12,780)
7
July
299,916
267,919
46,369
(14,372)
39
Aug.
311,949
250,472
47,119
14,358
11
Sept.
301,141
265,976
46,061
(10,896)
40
Oct.
237,897
220,809
35,035
(17,947)
29
1951
$2,006,162
$1,785,983
$314,796
[94,617)
$ 61
*85 Partnership returns of income (Form #1065) were filed for the Riverview Club for each of the five above-mentioned periods, in which returns net losses were reported as follows: Net Loss
Loss Shown
Period
Reported
by Books
Jan. 11-Dec. 31, 1949
$48,091
$64,618
Jan. 1-Jan. 7, 1950
18,922
18,937
Feb. 19-Mar. 20, 1951
41,861
42,088
Mar. 21-Apr. 29, 1951
12,963
13,140
May 4-Oct. 25, 1951
38,785
39,389
Petitioner George Reyer, in the joint return for 1949, claimed a loss from the Riverview Club of $5,031.32. The respondent determined that instead of a loss he had a gain from the Club for that year of $13,225.54. For the year 1950, Reyer reported neither gain nor loss from the Club. The respondent determined that he had a gain of $90.99. Petitioner Francis B. Mills, in the original joint return for 1949, claimed a loss from the Riverview Club of $9,200. An amended joint return for 1949 was filed in which Mills reduced the claimed loss from the Riverview Club to $4,809.10. The respondent determined that instead of a loss Mills had a gain from the Club for that year of $13,225.54. For the year 1950 Mills reported *86 neither gain nor loss from the Club. The respondent determined that he had a gain of $90.99. For the year 1951 the respondent determined that Mills understated his distributable income from the Riverview Club by $15,059.83. The respondent in his determinations, as set forth in the two preceding paragraphs, allowed the losses on those days that showed a net win for the day but disallowed the net losses on those days that showed a net loss for the day instead of a net win. Edward J. Rusich was the bookkeeper of the Riverview Club from January 11, 1949, to the latter part of 1951. He kept as a permanent record of the Club the games book and the expense book. A typical page from the games book is the page for March 18, 1949, which is as follows: March 18, 1949
Balance fwd
53376
- 1592
51784
over +
2
51786
in
out
+
-
Race book
1201
1201
Big Game #1
1271
1116
155
608 #1
294
190
104
608 #2
wheel #1
121
151
30
Bl. Jack #1
208
245
37
Keno cut
58
58
Duplicates
339
133
206
Expenses
1705
1705
Big Game #2
1674
1694
20
608 #3
605
304
301
608 #4
276
114
162
wheel #2
147
69
78
wheel #3
212
49
163
wheel #4
288
167
121
wheel #5
163
185
22
wheel #6
95
86
9
Bl. Jack #2
89
23
66
5840
7432
1423
3015
5840
1423
-1592
-1592
Race Book
10000
1
1650
5
2000
10
14000
Big
5000
Old
1776
Safe stds.
1907
Safe sil.
850
Day cashier
10600
sil.
609
Big game stds.
600
Cks.
561
Ck. acct.
1833
Bl. Jack 1
200
2
200
51786
*87 The balance forward of $53,376 means that the Club began business on March 18, 1949, with a bank roll of $53,376; that it had a net loss for the day of $1,592, which reduced the bank roll to $51,784; that after counting all the money at the end of the day, the count showed $2 over or a bank roll at the close of the day of $51,786. The figures at the bottom of the page show how the bank roll was made up, namely, the denominations of the bills, checks, silver, etc. Neither petitioner George Reyer nor petitioner Francis B. Mills took an active part in the management or operation of the Riverview Club. New Crescent Club Petitioner Francis B. Mills owned a 9 percent partnership interest in a partnership called the New Crescent Club. Partnership returns of income (Form #1065) were filed for the New Crescent Club, one for the period October 25, 1951, through April 30, 1952, showing a net income of $80,290, and one for the period May 1, 1952, through December 31, 1952, showing a net income of $13,683. Petitioner Francis B. Mills reported in the joint return for the calendar year 1952 his 9 percent share of the partnership profits in the amount of $7,226.10 for the first period, plus *88 $1,231.47 for the second period, or a total from both partnerships of $8,457.57. The respondent determined that for both of the above periods ending in 1952 the New Crescent Club had a net income of $292,958 and that petitioner Francis B. Mills' 9 percent share thereof amounted to $26,366.22 instead of the amount of $8,457.57 reported on the joint return. Paragraph 26 of the stipulation of facts is as follows: 26. The New Crescent Club, 6979 North Peters Street, Arabi, Louisiana, was a partnership involved in off-track betting on horses from October 25, 1951 to October 31, 1951, and from October 25, 1951 to May 19, 1952, the Club was primarily a casino operation. Francis B. Mills owned a 9 percent interest in the New Crescent Club for the period October 25, 1951 to May 19, 1952. For the period October 25, 1951, to May 19, 1952, the New Crescent Club had certain permanent records from which correct and accurate transcripts have been made and stipulated as Exhibits 25-Y and 26-Z. Exhibit 25-Y is a transcript of the games book and Exhibit 26-Z is a transcript of the expense book. Respondent has allowed all of the expenses. The transcript of the games book shows for each day in *89 each period in columnar form the bank roll opening, the in, the out, win or (lose), expenses, net win or (net loss), over or (short) and the bank roll balance at the end of the day. A recapitulation of the ins, outs, expenses, net wins or (net losses) and over or (shorts) from October 25, 1951, through May 19, 1952, is as follows: (Note: cents were disregarded if under 50 cents; if over 50 cents, amount was raised to the next dollar) Net Wins or
Over or
Month
Ins
Outs
Expenses
(Net Losses)
(Short)
Oct.
$ 202,241
$ 145,495
$ 51,240
$ 5,506
($ 63)
Nov.
638,279
508,225
113,488
16,566
18
Dec.
762,054
613,364
145,816
2,874
( 339)
Jan.
719,137
570,253
116,810
32,074
( 199)
Feb.
614,005
484,176
116,661
13,168
( 79)
Mar.
571,810
479,022
121,944
(29,156)
( 114)
Apr.
469,650
336,782
96,918
35,950
( 88)
May
341,369
264,448
72,953
3,968
114
$4,318,545
$3,401,765
$835,830
$80,950
( $750)
Albert Salzer was in charge of the office and of the books and records of the New Crescent Club. He also had a 9 percent interest in the Club. A typical page from the games book of the New Crescent Club for November 28, 1951, is *90 similar in form to the typical page from the games book of the Riverview Club for March 18, 1949, and shows that the method of bookkeeping was substantially the same for both clubs. The records made in the games book and expense book were made at the end of each day from certain memoranda that were made as the different games progressed. These memoranda were considered as nothing more than scratch records and were destroyed as soon as recorded in the games book. Some of the scratch records were kept only an hour or two. If all the scratch records were available, they should show exactly what is in the games and expense books. The respondent in his determination of the net income of the New Crescent Club allowed the losses on those days that showed a net win for the day but disallowed the losses on those days that showed a net loss for the day instead of a net win. Petitioner Francis B. Mills did not take an active part in the management or operation of the New Crescent Club. Petitioner George Reyer was not a member of the New Crescent Club. Alton and Reyer Partnership Paragraphs 28 and 29 of the stipulation of facts are as follows: 28. Alton and Reyer, 407 Jefferson Highway, *91 New Orleans, Louisiana, was a partnership involved in betting on basket ball games during the taxable year 1949. George Reyer owned a fifty percent interest in the partnership Alton and Reyer during the taxable year 1949. 29. No books and records of the partnership Alton and Reyer were available for the taxable year 1949. Petitioners George and Rosalie Reyer in their joint return for 1949 claimed a loss from the Alton and Reyer partnership of $11,345. The respondent disallowed the loss and determined that petitioners' net income for 1949 was understated by the amount of the claimed loss. Miscellaneous Findings For the calendar year 1951 petitioner George Reyer had no gambling income. Petitioner George Reyer joined the police department in New Orleans on November 19, 1917, when he was approximately 22 years of age. He started as a "rookie cop on a beat" and advanced to the grade of detective, then to captain of detectives, and later, in 1931, to the head of the department which in New Orleans is called the Superintendent of Police. He held the latter position until May 1946 when he retired on a pension. His largest salary while superintendent of police was $6,000 annually. *92 Reyer knew Brouphy for approximately 30 years. Brouphy was a professional gambler. He did not have a police record. After Reyer retired from the police department he invested $10,000 in Club 407 at the suggestion of Brouphy and Alton Mills. At the time of the hearing, Reyer was worth around $100,000 in stocks and bonds. At the time of the hearing petitioner Francis B. Mills was 82 years of age and deaf. Petitioners have all signed waivers of the statute of limitations for all of the years here involved. Ultimate Findings of Fact Petitioners Rosalie Lala Reyer and George Reyer had no unreported taxable income from the partnerships 407, Monticello, Pat's or Riverview Clubs during the taxable years 1948 through 1951. They did not sustain a loss of $11,345 during the taxable year 1949 in the operation of the partnership of Alton and Reyer during that year. Petitioners Francis B. Mills and Josie Mills had no unreported taxable income from the partnerships 407, Monticello, Pat's, Riverview or New Crescent Clubs during the taxable years 1948 through 1952. Opinion The only issue remaining for decision is primarily a question of fact which must be resolved from the evidence *93 introduced in the instant case. The many cases involving persons engaged in the business of gambling cited by both parties are of little help in deciding a case of this kind. Of course, the respondent's determination is presumed to be correct and the burden of proof was upon petitioners to prove otherwise. See our Rules of Practice, Rule 32. We think, with one exception hereinafter noted, petitioners have met their burden. It may be noted at the outset that petitioners' burden has been made more difficult because of the length of time taken by the respondent in making his determination which goes back to the taxable year 1948. For this one year alone as many as eight consents, fixing the period of limitation upon assessment of additional income taxes, have been requested by the respondent and obtained from the petitioners. In the meantime, material witnesses have died or become more difficult to contact. Notwithstanding these impediments, petitioners have produced an overwhelming mass of evidence in support of the correctness of the permanent books and records kept by the several partnerships here involved. "Correct and accurate transcripts" of these books and records have been made *94 and stipulated as exhibits to the stipulation of facts filed at the hearing, and petitioners have assembled the several bookkeepers of such books, who have long since gone to other positions of employment but who returned to testify fully as to their method of keeping exact and accurate records of the numerous transactions in which these partnerships engaged. We are impressed with the completeness of their testimony and cannot believe that net income from these several partnerships was received and unreported as respondent has determined. The reason for the respondent's determination of such large deficiencies is due to the fact that certain memoranda used by the bookkeepers in recording the permanent records of the several partnerships were later destroyed. The respondent contends that without the memoranda there is no way to check the accuracy of the permanent records. There is merit in such a contention and it requires strong proof on the part of petitioners to show that the permanent records are correct. We think, however, petitioners have supplied such proof. The several bookkeepers of the several partnerships all testified that the permanent records were all made at the close *95 of the day from the memoranda; that the permanent records were exact and correct; that no one handling the cash could leave for the day before the cash was found to be substantially in accordance with the memoranda (with no variance greater than $40); and that, if all of the memoranda could now be produced, the memoranda would show no different results than are shown by the permanent records. Either these witnesses were committing perjury or they were telling the truth. We believe the latter. The respondent offered no evidence to show that any of the permanent records were erroneous and he has not charged any of the petitioners with fraud. If the records were incorrect to the extent determined by the respondent, it would seem that a substantial fraud had been committed. Petitioners also introduced the testimony of the revenue agent, Anthony J. Calico, upon whose report the large deficiencies herein were based. Calico testified that he accepted as correct the gross "ins" for each day and also allowed as correct all of the expenses shown in the permanent records. He also testified that if the net result for the day showed a net win he would approve the record for that day's activity *96 and accept the "outs" as having been substantiated. But, if the net result for the day showed a net loss, he would hold that the "outs" had not been substantiated to the extent of the net losses and that such net losses should be treated as unreported gambling income. Calico said "I just decided on that particular method, and I used that method." He further testified that he knew of no recognized method of doing it that way and that this was the first time he had ever made a determination in this manner. We do not think the respondent may thus choose and reject from the same records. The parts chosen have no more trustworthiness than the parts rejected. We think the evidence offered by petitioners on the 407, Monticello, Pat's, Riverview, and New Crescent Clubs clearly shows that the respondent's determination was arbitrary and that it should be set aside as to these clubs. The testimony of the various witnesses, the bookkeepers who actually made the day-by-day permanent records, was so frank and complete that we think the factual situation here is so different from the factual situations in such cases as Jack Showell, 23 T.C. 495, [1] and Plisco v. United States, 306 F. 2d 784, *97 June 28, 1962, affirming 192 F. Supp. 337, as to make those cases wholly distinguishable from the instant case on the facts. The factual situation in the instant case is very much like the one District Judge Chesnut had before him in Bechelli v. Hofferbert, 111 F. Supp. 631, wherein, among other things, Judge Chesnut said: At the end of each day Giangrandi * * * prepared a written itemized statement showing the cash receipts of the day as taken from the tape on the cash register and an itemized statement of the expenses paid for the day * * *. The daily sheets were not preserved but the receipts for the day and the expenses of the business, the latter separately classified, were recorded in permanent books which were offered in evidence. These books show that such an entry was made for each day of the month. * * * The testimony of the witnesses satisfied me that the bookkeeping was honestly and fairly done and that the figures entered in the books for gross income and expenses were substantially correct. The critical test as to the sufficiency of the books on their face is whether they are sufficient to calculate the net income. If they are sufficient in *98 this respect then the simpler the books the better. There is no prescribed detail as to just what books or how many must be kept. The question in each case must be determined on its particular facts and in view of the nature, volume and complexity of the business. Here the books as kept do show day by day receipts and expenses. If the figures are correct the books are sufficient to show the net income. * * * The chief contention of government counsel as to the alleged inadequacy of the records is that the partnership did not preserve the daily cash register receipts or table checks to support the figures in the books after the entries had been made in the permanent book. * * * Counsel for the parties have cited a number of cases tending to support their respective contentions with regard to the adequacy of the partnership books but both freely admit that none are of themselves controlling precedents in view of the particularities of the case. I think it unnecessary to extend this opinion by reference to the facts of these cited cases except to say that many of them have been examined and most are not really even closely parallel on the facts to the instant case, with the exception *99 that a few cases in the Tax Court may be thought to present not very different factual situations where the books were found adequate under the special facts. Ward v. Commissioner, 1948, 7 T.C.M. 505; Miller v. Commissioner, 1951, 10 T.C.M. 33; Shinkonis v. Commissioner, 1951, 10 T.C.M. 503. To the same effect see Alfred A. Nahman, 21 B.T.A. 121. In the instant case it is obvious that if 3 or 4 days were put together an entirely different result would be obtained. The viciousness of the respondent's method of rejecting the books only on those days that show net losses may well be illustrated by what we said in the early case of James P. McKenna, 1 B.T.A. 326, 333, regarding a hypothetical poker player who played poker 250 nights a year and every night would win $5,000 and then lose $5,500. We said: At the end of the year he is actually poorer by $125,000 *100 than when he began. Yet during the year he has won pots aggregating $1,250,000. We are unable to concede that in such a case he has an actual gain of $1,250,000. In the instant case we are unable to concede that petitioners realized unreported taxable income as determined by the respondent. Income should be determined by considering the year in its entirety instead of accepting those days only when net gains are made and rejecting those days when net losses occurred. We hold that petitioners had no unreported taxable income from the partnerships 407, Monticello, Pat's, Riverview, or New Crescent Clubs during the taxable years in question. Regarding the claimed loss of $11,345 by petitioners George and Rosalie Reyer for the year 1949 from the Alton and Reyer partnership, we do not think petitioners have sustained their burden of proof. It was stipulated that no books and records of the partnership were available. The only evidence offered by petitioners consisted of the unsupported testimony of George to the effect that this was a basketball deal handled by Brouphy; that Alton Mills was the other partner; that Brouphy kept the records; and that I put up $5,000, and that got *101 lost, and I put up another $3,000 and that got lost and I put up another $3,000 and that got lost and so Mr. Brouphy spoke to me and said, "That is gone again." I said, "Well, when I lose $11,000, I quit." We do not think George's testimony alone is sufficient to overcome the prima facie correctness of the respondent's determination. Of course, Brouphy was dead and could not testify but it would seem that petitioners might have offered the testimony of the other partner. In any event, we do not think the evidence offered sufficiently proves that the respondent's determination as to this issue was erroneous. We sustain the respondent's determination as to this issue. Decisions will be entered under Rule 50. Footnotes
1. Proceedings of the following petitioners have been consolidated herewith for purposes of trial, briefs, and opinion: George Reyer, Docket No. 82013; George Reyer and Rosalie Lala Reyer, Docket No. 82014; and Francis B. Mills and Josie Mills, Docket No. 82068.↩
*. It is noted that the partnership return for this period showed a loss of $30,098.85 instead of $32,858.25.↩
*. Discrepancy of $1,498.↩
1. Reversed and remanded by C.A. 9, 238 F. 2d 148; T.C. Memo. 1957-22, again reversed and remanded by C.A. 9, 254 F. 2d 461; and T.C. Memo. 1960-7, affirmed per curiam by C.A. 9, 286 F. 2d 245↩.